FILED

2016 OCT 19  PM 12: 07

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | I N D I C T M E N T |
| | ) | |
| Plaintiff, | ) | 1 : 16   CR   329 |
| | ) | |
| v. | ) | CASE NO. _____ JUDGE LIOI |
| | ) | Title 18, United States Code, |
| EDWARD R. HILLS, | ) | Sections 2, 371, 666, 1341, 1343, |
| SARI ALQSOUS, | ) | 1346, 1349, 1512, 1951 and |
| YAZAN B. AL-MADANI, | ) | 1962(d); Title 26, United States |
| TARIQ SAYEGH, | ) | Code, Section 7206(1); and Title |
| | ) | 42, United States Code, Sections |
| | ) | 1320a-7b(b)(1)(A) and 1320a- |
| Defendants. | ) | 7b(b)(2)(A) |
| | ) | |

The Grand Jury charges:

<u>General Allegations</u>

At all times material herein:

***Public Entities and Programs***

1.     The MetroHealth Hospital System ("MetroHealth") was a "county hospital"

established and operated under Chapter 339 of the Ohio Revised Code.  It was owned by the

County of Cuyahoga (the "County"), Ohio, in the Northern District of Ohio, and was operated

and governed on behalf of the County by the Board of Trustees of the MetroHealth System.

MetroHealth was a public health care system for the County.

2.     MetroHealth operated a Dental Health program ("MetroHealth Dental") in the

Cleveland, Ohio, metropolitan area in the Northern District of Ohio.  MetroHealth Dental was a

sub-division within MetroHealth.

3.      MetroHealth and MetroHealth Dental operated under the MetroHealth Board of Trustees ("the MetroHealth Board"), which bore responsibility for the entire management and control of MetroHealth and MetroHealth Dental, including the use of all funds and property used and received in operating MetroHealth and MetroHealth Dental.  In executing these duties, the MetroHealth Board delegated certain responsibilities to MetroHealth employees, including the President, Chief Executive Officer, and Chief Operating Officer of MetroHealth, to manage and maintain the budget, goals and objectives of the MetroHealth Hospital System as a county hospital.

4.      The activities and operations of MetroHealth and MetroHealth Dental affected interstate commerce.

5.      MetroHealth was a Medicaid-approved provider of services and was a health care benefit program as defined by Title 18, United States Code, Section 24(b).

6.      The Medicaid program of the United States and the state of Ohio was established to provide medical assistance to low-income persons.  The state of Ohio administered the Medicaid program for its residents first through the Ohio Department of Job and Family Services, and later through the Ohio Department of Medicaid.  The United States provided approximately 60% of the money for the Ohio Medicaid program, with the remaining cost provided by the state of Ohio.   Medicaid, and specifically the Ohio Medicaid program, were "health care benefit programs" as defined by Title 18, United States Code, Section 24(b).

7.      The Centers for Medicare and Medicaid Services ("CMS") was a federal agency under the United States Department of Health and Human Services that nationally administered Medicare and Medicaid.  Individuals who received benefits under Medicare or Medicaid were referred to as "beneficiaries" or "recipients."

8.     By becoming participating providers in Medicaid, enrolled providers agreed to abide by the policies, procedures, rules and regulations governing reimbursement. In order to claim and receive Medicaid funds, enrolled providers, together with their authorized agents, employees, and contractors, were required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules and regulations issued by CMS, the Ohio Department of Medicaid, and their authorized agents and contractors.

9.     Enrolled providers were given and provided access to Medicaid manuals and services bulletins describing proper billing procedures and billing rules and regulations. Providers were notified that Medicare and Medicaid would not pay claims procured through kickbacks or bribes.

10.     Section 1115 of the Social Security Act of 1935, codified at Title 42, United States Code, Section 1315, allowed the Secretary of the Department of Health and Human Services to waive selected provisions of the Social Security Act to approve experimental, pilot or demonstration projects that promoted the objectives of the Medicaid programs ("Section 1115 Demonstrations"). To facilitate the Section 1115 Demonstrations, the CMS and the state's Medicaid program could agree to certain waivers of requirements of the Social Security Act otherwise applicable to all Medicaid programs, such as limiting the program to a portion of the state, limiting freedom of choice under the program to a select group of providers, and limiting the amount, duration and scope of the benefits packages under the program. The Section 1115 Demonstrations allowed states additional flexibility to design and improve upon their individual Medicaid programs and allowed the states and CMS to evaluate policy approaches such as: 1) expanding eligibility to individuals not otherwise Medicaid eligible; 2) providing services not

3

typically covered by Medicaid; and 3) using innovative service delivery systems to improve care, increase efficiency, and reduce costs.

11.     The MetroHealth Care Plus Medicaid Demonstration program ("Care Plus") was a Section 1115 Demonstration initiated by MetroHealth and the Ohio Department of Medicaid and its predecessors, with the approval of CMS, in or around February 2013 to provide health care coverage for up to 30,000 uninsured adults in Cuyahoga County, Ohio, in the Northern District of Ohio, prior to a statewide expansion of Medicaid. Care Plus was intended to provide coverage through MetroHealth to Cuyahoga County residents who had a family income at or below 133 percent of the Federal Poverty Line and who were not otherwise eligible for comprehensive benefits under the Ohio Medicaid plan. The Care Plus program was authorized from on or about February 5, 2013, through December 31, 2013, and reauthorized for calendar year 2014. The Care Plus program was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

12.     The Ohio State Dental Board ("OSDB") was an Ohio state agency established and operated under Chapter 4715 of the Ohio Revised Code. OSDB licensed and regulated the dental profession in Ohio. OSDB held the power and authority to suspend or terminate dentists' ability to practice in Ohio. OSDB allowed dentists whose licenses were suspended, lapsed or subject to consent agreements to reinstate their licenses by participating in OSDB-approved remediation programs.

13.     The activities and operations of OSDB affected interstate commerce.

***Public Servants and Officials***

14.     Ohio Revised Code Section 2921.02(A) provided that "no person, with purpose to corrupt a public servant or party official, or improperly to influence a public servant or party

4

official with respect to the discharge of the public servant's or party official's duty, whether before or after the public servant or party official is elected, appointed, qualified, employed, summoned, or sworn, shall promise, offer, or give any valuable thing or valuable benefit."

15.    Ohio Revised Code Section 2921.02(B) provided that "no person, either before or after the person is elected, appointed, qualified, employed, summoned, or sworn as a public servant or party official, shall knowingly solicit or accept for self or another person any valuable thing or valuable benefit to corrupt or improperly influence the person or another public servant or party official with respect to the discharge of the person's or the other public servant's or party official's duty."

16.    Ohio Revised Code Section 2921.01(A) defined a "public official" as "any elected or appointed officer, or employee, or agent of the state or any political subdivision, whether in a temporary or permanent capacity," and Section 2921.01(B)(1) defined a "public servant" as "any public official."

17.    Defendant EDWARD R. HILLS was a resident of Aurora, Ohio. HILLS was a licensed dentist authorized to practice in the state of Ohio. From in or around 1993 through in or around December 2014, HILLS was an employee of MetroHealth in the Northern District of Ohio. HILLS served as the Chief Operating Officer ("COO") of MetroHealth, and as the Director of MetroHealth Dental, from in or around 2010 through in or around December 2014. HILLS further served as the interim President and Chief Executive Officer of MetroHealth from in or around December 2012 through in or around July 2013. In his role as COO and Director of MetroHealth Dental, HILLS had authority and influence over, among other things: the management and disposition of resources and facilities at MetroHealth and MetroHealth Dental; the assessment and evaluation of MetroHealth and MetroHealth Dental employees; personnel

5

decisions affecting MetroHealth and MetroHealth Dental employees, including hiring, firing and disciplining employees, and approving raises and promotions; overseeing the revenue and profits of MetroHealth and MetroHealth Dental; and held a fiduciary duty to MetroHealth and MetroHealth Dental to ensure that MetroHealth and MetroHealth Dental operated within their budgets and met their financial goals including their revenue targets.   HILLS was a licensed provider under Medicaid.

18.     As an employee, COO, interim President and CEO, and Director of the MetroHealth Dental department, HILLS was a public official and public servant of MetroHealth Hospital, as those terms were defined by Ohio Revised Code, Section 2921.01.

19.     As an employee, COO, interim President and CEO, and Director of the MetroHealth Dental department, and as a public official and public servant, HILLS owed MetroHealth, MetroHealth Dental, the MetroHealth Board of Trustees and the citizens of Cuyahoga County a duty to act in their best interests and to provide them with his honest services.

20.     In his employment at MetroHealth, HILLS received compensation in the approximate amounts noted below:

| YEAR | APPROXIMATE SALARY |
|------|--------------------|
| 2008 | $437,001 |
| 2009 | $454,065 |
| 2010 | $531,926 |
| 2011 | $536,852 |
| 2012 | $620,022 |
| 2013 | $684,562 |
| 2014 | $718,330 |

21.     HILLS also served as a member of the OSDB from in or around 2000 through in or around April 2009.  During his tenure on the OSDB, HILLS served as President from in or around 2001 through in or around 2004, and as Secretary from in or around 2005 through in or

around April 2009. As Secretary, HILLS oversaw the regulatory and license enforcement operations of the OSDB, including the management of consent agreements, and the remediation efforts of dentists appearing before the OSDB whose Ohio dental licenses were suspended or lapsed.

22.     Defendant SARI ALQSOUS was a licensed dentist authorized to practice in the state of Ohio and an employee of MetroHealth. On or about November 3, 2008, ALQSOUS began working as a Resident Dentist at MetroHealth Dental. ALQSOUS worked as a full-time Attending Dentist at MetroHealth Dental from in or around 2010 through in or around April 2016. ALQSOUS was a licensed provider under Medicaid. In his employment at MetroHealth, ALQSOUS received compensation in the amounts listed below:

| YEAR | APPROXIMATE SALARY |
|------|--------------------|
| 2008 | $4,295 |
| 2009 | $37,964 |
| 2010 | $82,095 |
| 2011 | $212,755 |
| 2012 | $334,419 |
| 2013 | $374,931 |
| 2014 | $362,566 |

23.     As an employee of MetroHealth, ALQSOUS was a public official and public servant, as those terms were defined by Ohio Revised Code, Section 2921.01.

24.     As an employee of MetroHealth and MetroHealth Dental, ALQSOUS owed MetroHealth, MetroHealth Dental and the MetroHealth Board of Trustees a duty to act in their best interests and to provide them with his honest services.

25.     Defendant YAZAN B. AL-MADANI was a licensed dentist authorized to practice in the state of Ohio and an employee of MetroHealth. From in or around July 2007 through in or around April 2016, AL-MADANI was first a resident and then an attending dentist at MetroHealth Dental. On or about July 1, 2007, AL-MADANI began working as a Resident

Dentist at MetroHealth Dental. AL-MADANI worked as a full-time Attending Dentist at MetroHealth Dental from in or around 2010 through April 2016. AL-MADANI was a licensed provider under Medicaid. In his employment at MetroHealth, AL-MADANI received compensation in the amounts listed below:

| YEAR | APPROXIMATE SALARY |
|------|--------------------|
| 2008 | $49,848 |
| 2009 | $198,568 |
| 2010 | $210,653 |
| 2011 | $200,068 |
| 2012 | $253,888 |
| 2013 | $332,896 |
| 2014 | $278,792 |

26.     As an employee of MetroHealth, AL-MADANI was a public official and public servant, as those terms were defined by Ohio Revised Code, Section 2921.01.

27.     As an employee of MetroHealth and MetroHealth Dental, AL-MADANI owed MetroHealth, MetroHealth Dental and the MetroHealth Board of Trustees a duty to act in their best interests and to provide them with his honest services.

28.     Defendant TARIQ SAYEGH was a licensed dentist authorized to practice in the state of Ohio and an employee of MetroHealth. SAYEGH was a resident and then attending dentist at MetroHealth Dental from in or around 2008 through in or around 2012. In his employment at MetroHealth, SAYEGH received compensation in the amounts listed below:

| YEAR | APPROXIMATE SALARY |
|------|--------------------|
| 2008 | $39,331 |
| 2009 | $17,224 |
| 2010 | $12,137 |
| 2011 | $18,565 |
| 2012 | $2,596 |

29.     As an employee of MetroHealth, SAYEGH was a public official and public servant, as those terms were defined by Ohio Revised Code Section 2921.01.

30.     As an employee of MetroHealth and MetroHealth Dental, SAYEGH owed

MetroHealth, MetroHealth Dental and the MetroHealth Board of Trustees a duty to act in their

best interests and to provide them with his honest services.

***Relevant Private Entities***

31.     Oral Health Enrichment, LLC, ("OHE") was a for-profit, limited liability

corporation organized under the laws of the state of Ohio and incorporated by Defendant

EDWARD R. HILLS and his partner, Cooperating Witness 7 ("CW 7"). HILLS and CW 7

owned and operated OHE and were its only full-time employees. OHE had physical offices

located in Woodmere, Ohio, in the Northern District of Ohio. OHE was formally incorporated in

the state of Ohio in April 2009, but was formed and began operating no later than January 2009,

while HILLS was still Secretary of the Ohio State Dental Board.   OHE offered services to

dentists ("client dentists") across the United States, whose licenses were either revoked,

suspended or lapsed, in accordance with their respective state dental licensing authorities ("the

state dental boards") and offered to provide them with remediation services satisfactory to their

respective state dental boards, in order to help these dentists regain the ability to practice. OHE

held itself out and advertised itself as the "realization" of HILLS' "vision ... to develop a cost-

efficient remediation program for licensees that was under the sole direction of the Dental

Board." OHE further held itself out as having a "staff of educators ... who practice in a major

Midwest health care system." OHE claimed in its marketing that state dental boards would

benefit from using OHE because it had "Clinical assessment" facilities using, "1. Mannequins; 2.

Simulated patients; [and] 3. Robotic Technology," and provided a "Complete summary of

clinical assessment on competency and standard of care" in conjunction with "Continuous

feedback with the State Licensing Board." OHE also claimed in its marketing that individual

dentists benefited from using OHE's services because it offered "Clinical assessments ... after office hours and on weekend[s]," and "provided by practicing peers."

32.     OHE marketed itself nationally, and solicited referrals from the state dental boards, including OSDB, and also solicited customers and monies from individual client dentists located throughout the United States, including in the Northern District of Ohio, using direct mailings, a website and internet advertisements, and email communications to do so.

33.     The activities and operations of OHE affected interstate commerce.

34.     Buckeye Family Dental ("BFD") was a private dental clinic incorporated in the state of Ohio by AL-MADANI in or around April 2013.  BFD had an office in Cleveland, Ohio, in the Northern District of Ohio, and was operated by AL-MADANI and ALQSOUS.  BFD was not a part of the MetroHealth system.  BFD was a licensed Medicaid provider.

35.     The activities and operations of BFD affected interstate commerce.

36.     Noble Dental Clinic ("NDC") was a private dental clinic owned and operated by ALQSOUS and AL-MADANI.  NDC operated under the ownership of Cooperating Witness #8 ("CW 8") prior to ALQSOUS' and AL-MADANI's acquisition of the company.  From in or around at least January 1, 2009, through the date of this Indictment, NDC had and operated an office in East Cleveland, Ohio, in the Northern District of Ohio.  NDC was not a part of the MetroHealth system.  NDC was a licensed Medicaid provider.

37.     The activities and operations of NDC affected interstate commerce.

***Other Individuals***

38.     Cooperating Witness #1 ("CW 1") was a resident dentist at the MetroHealth Dental program.

39.     Cooperating Witness #2 ("CW 2") was a resident dentist at the MetroHealth
Dental program.

40.     Cooperating Witness #3 ("CW 3") was a resident dentist at the MetroHealth
Dental program.

41.     Cooperating Witness #4 ("CW 4") was a trained dentist, not otherwise involved
with the MetroHealth Dental program.

42.     Cooperating Witness #5 ("CW 5") was a resident dentist in the MetroHealth
Dental program and a relative of CW 4.

43.     Cooperating Witness #6 ("CW 6") was initially a resident dentist, and then later
an attending dentist in the MetroHealth Dental program.

44.     Cooperating Witness #7 ("CW 7") was a business partner with HILLS in the OHE
business.

45.     Cooperating Witness #8 ("CW 8") was a former owner of NDC, who later sold
that business to ALQSOUS and AL-MADANI in or around April 2013.

46.     Cooperating Witness #9 ("CW 9") was an attending dentist at the MetroHealth
Dental program, who also owned and operated a private dental clinic in the Cleveland, Ohio,
metropolitan area.  The activities and operations of CW 9's private dental clinic affected
interstate commerce.

47.     Attorney #1 was an attorney licensed to practice law in the state of Ohio.

48.     Public Employee 1 ("PE 1") was an attorney licensed to practice in the state of
Ohio.  From in or around 1997 through in or around September 2015, PE 1 served as the
Executive Director for the OSDB.

11

The Grand Jury further charges:

## COUNT 1
RICO Conspiracy
(Title 18, U.S.C. § 1962(d))

49.     The factual allegations of Paragraphs 1-48 of this Indictment are hereby repeated, re-alleged and incorporated by reference as if fully set forth herein.

### The Enterprise

50.     At all times material to this Indictment, MetroHealth constituted an "Enterprise," as that term is defined in Title 18, United States Code, Section 1961(4), which was engaged in, and the activities of which affected, interstate commerce.

51.     Defendant EDWARD R. HILLS was employed by and associated with the MetroHealth Enterprise.

52.     Defendant SARI ALQSOUS was employed by and associated with the MetroHealth Enterprise.

53.     Defendant YAZAN B. AL-MADANI was employed by and associated with the MetroHealth Enterprise.

### Purposes of the Defendants

54.     The Defendants' purposes included the following:

      a.  Enriching HILLS, ALQSOUS, and AL-MADANI, their co-conspirators and designees, through bribery, fraud, theft and extortion under color of official right.

      b.  To promote and enhance Defendants' and their associates' activities.

      c.  To guard, conceal and otherwise protect the activities of the Defendants and their associates from detection by law enforcement officials, as well as from exposure to MetroHealth or the public.

## The Racketeering Conspiracy

55.      Beginning in or around January 2008, and continuing to in or around April 2016, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI and others known and unknown to the Grand Jury, being persons employed by and associated with an enterprise engaged in, and the activities of which affected, interstate commerce, namely, the MetroHealth Enterprise, did knowingly and intentionally conspire with each other and with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the MetroHealth Enterprise through a pattern of racketeering activity consisting of:

multiple acts indictable under the following provisions of federal law:

   a.   18 U.S.C. § 1951 (relating to Hobbs Act Bribery and Hobbs Act Conspiracy);

   b.   18 U.S.C. § 1341, including § 1346 (relating to Mail Fraud);

   c.   18 U.S.C. § 1343, including § 1346 (relating to Wire Fraud); and

   d.   18 U.S.C. § 1512 (relating to Tampering with a Witness, Victim or Informant);

and multiple acts involving bribery chargeable under the following provision of state law:

   e.   Ohio Revised Code Section 2921.02 (relating to Bribery).

56.      It was a further part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

## Means and Methods of the Conspiracy

Among the means and methods by which Defendants and their associates conducted and participated in the conduct of the affairs of the MetroHealth Enterprise were the following:

13

57.     HILLS, ALQSOUS, AL-MADANI and others used and agreed to use their powers as employees of MetroHealth, and of departments under the influence of MetroHealth, to take, cause to be taken, and influence actions, including actions in connection with: (1) taking public personnel actions; (2) executing public business; (3) executing private business; and (4) managing patients, customers and clients of MetroHealth, in exchange for and in return for things of value for themselves and their designees, to which they were not entitled.

58.     To facilitate and conceal the acts and schemes discussed below, HILLS, ALQSOUS, AL-MADANI and others engaged in multiple cash transactions among themselves and with others.

### *The Schemes*

*Stream of Benefits to HILLS*

59.     HILLS demanded, solicited and accepted things of value from dentists working at MetroHealth, including ALQSOUS, AL-MADANI and others in return and in exchange for taking and promising to take actions that benefitted those employees and their designees.

60.     ALQSOUS, AL-MADANI and others gave HILLS things of value, including cash, checks, a luxury briefcase, a large-screen television, apartment and hotel rentals, airline flights and flight upgrades, loans that were never repaid, and other things of value for HILLS and his designees in return for favorable official actions by HILLS, as further described in the factual allegations of Paragraphs 107-192 of this Indictment.

*Dental Residency Bribery Scheme*

61.     ALQSOUS, AL-MADANI and others engaged in a bribery scheme concerning the MetroHealth Dental Resident Program, as further described in the factual allegations of Paragraphs 194-196, 204-220, 222-261, 263, and 269-270 of this Indictment.

*Oral Health Enrichment Scheme*

62.     HILLS, ALQSOUS and AL-MADANI, and others, misused their positions at
MetroHealth to run HILLS' private business, Oral Health Enrichment, at MetroHealth locations,
using MetroHealth money, property, time and resources, at MetroHealth's expense and to
HILLS' private and personal benefit as further described in the factual allegations of Paragraphs
281-282, 286-302, and 304-305 of this Indictment.

*Dental Patient Kickback and Bribery Scheme*

63.     HILLS directed that dental patients be referred from MetroHealth to ALQSOUS'
and AL-MADANI's private clinic, Buckeye Family Dental, in return for bribes and kickbacks
from ALQSOUS and AL-MADANI, and caused MetroHealth to lose income from these referred
patients, as further described in the factual allegations of Paragraphs 310, 313-315, 317-330, 336,
and 340 of this Indictment.

*Obstruction of Justice and Tampering with Witnesses Scheme*

64.     HILLS, ALQSOUS, AL-MADANI and others, in order to keep their positions in
the MetroHealth Enterprise and to continue engaging in the activities of the MetroHealth
Enterprise, sought to protect their interests by concealing their crimes from others.  The
concealment of Defendant's criminal activities included, among others, obstruction of justice,
threatening, intimidating and harassing potential witnesses, making false statements and lying to,
and engaging in misleading conduct towards potential witnesses, and concealing the criminal
schemes from others at MetroHealth, the public and law enforcement as further described in the
factual allegations of Count 29 of this Indictment.

15

*Defrauding MetroHealth of Money and Property – Attorney 1 Scheme*

At all times material to this scheme:

65.     Defendant EDWARD R. HILLS resided in Aurora, Ohio, in a residence subject to a condominium association named Deer Island of Walden Condominium Association ("the Condo Association"). As part of his membership in the Condo Association, HILLS was required to pay monthly fees for general maintenance and upkeep ("condo fees").

66.     On or about July 27, 2009, the Condo Association filed a civil foreclosure lawsuit against HILLS and his wife for failure to pay their condo fees. This case was titled, *Deer Island of Walden Condominium Association v. Edward R. Hills, II, et. al.*, and was filed in the Portage County (Ohio) Court of Common Pleas under Case Number 2009-CV-01103 ("the foreclosure matter").

67.     Attorney 1 represented HILLS in this foreclosure matter.

68.     Before the filing of the foreclosure matter, Attorney 1 was also a dental patient of HILLS and received minimal treatment from HILLS at MetroHealth Dental.

69.     Beginning in or around January 2008, and continuing through in or around May 2011, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants EDWARD R. HILLS, SARI ALQSOUS, and others, engaged in a scheme and artifice to defraud MetroHealth and MetroHealth Dental of money and property, to wit, dental implants, root canals, dental repairs, dental supplies and dental services diverted to Attorney 1 and fees for services while Attorney 1 rendered legal services for HILLS as requested and as the opportunity arose, including Attorney 1's representation of HILLS in a personal foreclosure matter unrelated to HILLS' employment and responsibilities at MetroHealth and MetroHealth Dental, in violation of Title 18, United States Code, Section 1341.

In furtherance of this scheme:

70.     Beginning in or around January 2008, HILLS instructed CW 6, a dentist employed at MetroHealth Dental and subject to HILLS' authority, and others to begin ordering dental supplies including crowns, veneers and implants for Attorney 1, from a laboratory located in Torrance, California.

71.     Beginning in or around June 2008, HILLS stopped paying the condo fees for his residence in Aurora, Ohio.

72.     From in or around June 2008 and continuing through at least in or around July 2009, HILLS continued to not pay his condo fees, resulting in the condo association filing a lien against his property on or about April 2, 2009.

73.     On or about September 4, 2009, Attorney 1 filed a "Request for Leave to Plead" in the foreclosure matter on behalf of Defendant EDWARD R. HILLS.

74.     On or about September 21, 2009, HILLS instructed CW 6 to begin a course of dental treatments for Attorney 1, to include multiple dental implants, root canals and dental repairs.

75.     On or about September 21, 2009, CW 6, acting on HILLS' instructions, created a treatment plan to provide for the delivery of dental crowns, implants and other services for Attorney 1 for approximately 12 of Attorney 1's teeth.

76.     On or about September 21, 2009, HILLS further instructed CW 6 to falsely claim that the course of treatment for Attorney 1 was "educational" so that Attorney 1 would not have to pay for the treatment.

77.     On or about September 21, 2009, Attorney 1 received dental treatments at MetroHealth Dental, provided by CW 6, including a series of surgical endosteal implants.

78.    On or about October 5, 2009, Attorney 1 filed an "Answer of Defendant Edward R. Hills II," on behalf of HILLS, in the foreclosure matter.

79.    On or about October 5, 2009, and continuing through in or around May 2011, Attorney 1 continued to represent HILLS in the foreclosure matter.

80.    From in or around October 2009 through in or around April 2011, Attorney 1 also received and continued to receive dental implants, crowns, and other services from CW 6 and also from Defendant SARI ALQSOUS, and other MetroHealth dentists, at HILLS' instructions.

81.    Attorney 1 did not pay MetroHealth for the dental services he received for his dental implants, crowns, and other services, from CW 6, ALQSOUS or other MetroHealth dentists acting under the direction of HILLS, from in or around September 2009 through in or around April 2011.

82.    HILLS instructed Attorney 1 to pay him, directly, for the costs of the supplies used for Attorney 1's dental services received at MetroHealth. HILLS never reimbursed or otherwise paid MetroHealth or MetroHealth Dental for the costs of the services and goods provided to Attorney 1 at HILLS' direction.

83.    As a result of the ongoing treatment for Attorney 1, HILLS, ALQSOUS and others caused MetroHealth to incur losses, through the ordering of dental supplies, including temporary dental crowns, porcelain crowns and veneers manufactured from a dental laboratory in California, and the rendering of dental services for the delivery of crowns, implants and veneers, and other services, in excess of approximately $24,000.

84.    For purposes of executing the above scheme to defraud, HILLS, ALQSOUS and others caused to be delivered by United States Postal Service and by private and commercial interstate carriers, according to the directions thereon to MetroHealth in the Northern District of

Ohio, things, to include dental supplies including crowns, veneers and implants for Attorney 1's treatment at MetroHealth.

*Defrauding MetroHealth of Money and Property – Free Labor Scheme*

85.     In or around 2009 and continuing to in or around 2013, CW 8 owned and operated Noble Dental Clinic ("NDC").  CW 8 was not a licensed dentist authorized to practice in the state of Ohio, so CW 8 hired other dentists to provide dental services at NDC and paid those dentists by either offering hourly wages or profit sharing in the NDC business.

86.     In or around 2009, in order to continue providing dental services through NDC, CW 8 contacted HILLS for assistance in securing properly licensed and insured dentists for NDC.

87.     The Ohio State Dental Board granted Limited Resident's Licenses to graduates of dental schools who were authorized to practice in another state or country, or qualified to take the regular licensing examination in Ohio, and who furnished the OSDB with satisfactory proof that they were appointed as a dental resident at an accredited Ohio dental college or at an accredited program of an Ohio hospital, but who had not yet been licensed as a dentist by the Board.

88.     Any person receiving such Limited Resident's License was allowed to practice dentistry only in connection with programs operated by the dental college or hospital at which he was appointed as a resident as designated on his Limited Resident's License, and only under the direction of a licensed dentist who was a member of the staff thereof, or a dentist holding a current limited teaching license, and only on bona fide patients of such programs. If the residency program changed, the dentist was required to submit a new application for a limited resident's license.

89.     The OSDB also granted Limited Teaching Licenses to dentists who were graduates of a dental college, were authorized to practice dentistry in another state or country, and had full-time appointment to the faculty of an endorsing dental college. A person holding a limited teaching license could practice dentistry only in connection with programs operated by the endorsing dental college.

90.     In or around 2009 and continuing through in or around 2010, in the Northern District of Ohio, Eastern Division, and elsewhere, HILLS, ALQSOUS, AL-MADANI and others engaged in a scheme and artifice to defraud MetroHealth of money and property, to wit, wages paid to MetroHealth Dentists working at NDC, in violation of Title 18, United States Code, Section 1341.

91.     From on or about September 18, 2008, through on or about July 16, 2010, ALQSOUS possessed only a Limited Resident's License as a dentist in the state of Ohio, and his license was limited to the dental residency program operated by MetroHealth Dental.

92.     From on or about March 26, 2007, through on or about October 15, 2009, AL-MADANI possessed only Limited Resident's and Limited Teaching Licenses in the state of Ohio, and his licenses were limited to the dental residency program operated by MetroHealth Dental.

93.     MetroHealth Dental provided malpractice insurance coverage for resident and teaching dentists for work those dentists completed for MetroHealth Dental patients, at MetroHealth Dental facilities. The malpractice insurance did not cover employment or dental practices that were not a part of the MetroHealth system.

In furtherance of this scheme:

94.     In or around 2009, HILLS and CW 8 agreed that HILLS would provide MetroHealth dentists, including ALQSOUS and AL-MADANI, who would practice at NDC under HILLS' and CW 8's direction.

95.     In or around 2009, shortly after HILLS and CW 8 reached the agreement described in Paragraph 94 above, HILLS falsely instructed MetroHealth Dentists that MetroHealth was considering buying NDC and that the staff should consider NDC to be affiliated with MetroHealth.

96.     In or around 2009, HILLS instructed ALQSOUS, AL-MADANI, CW 9 and other MetroHealth dentists, who were full-time employees of MetroHealth, whose wages were paid by MetroHealth, to work at NDC on a part-time basis, during regular business hours.

97.     In or around 2009, HILLS instructed CW 8 to pay him and his company, Oral Health Enrichment, the wages owed to ALQSOUS and AL-MADANI rather than directly paying them.

98.     From in or around 2009 through in or around 2010, ALQSOUS and AL-MADANI continued to receive and obtain a full-time salary from MetroHealth, while they were also working at NDC on HILLS' behalf.

99.     From in or around 2009 through in or around 2010, HILLS did not provide ALQSOUS and AL-MADANI with the wages paid by CW 8 for their labor at NDC.

100.     ALQSOUS and AL-MADANI continued to practice dentistry at NDC using the malpractice insurance they received through MetroHealth, even though, as they and HILLS then well knew, they were not allowed to practice under that malpractice insurance for non-MetroHealth entities.

101.    From in or around 2009 through in or around 2010, HILLS, ALQSOUS and AL-MADANI concealed from MetroHealth officials and the MetroHealth Board of Trustees the fact that they were engaged in non-MetroHealth business during regular business hours and while they received a full-time salary from MetroHealth.

102.    For purposes of executing the above scheme to defraud, HILLS, ALQSOUS and AL-MADANI caused to be delivered by United States Postal Service and by private and commercial interstate carriers, according to the directions thereon to and from various locations in the Northern District of Ohio, matters, to include insurance claims and checks for NDC patients treated by ALQSOUS and AL-MADANI, a Limited Teaching License for AL-MADANI, and IRS Forms 1099 for HILLS and OHE.

All in violation of Title 18, United States Code, Section 1962(d).

The Grand Jury further charges:

## COUNT 2
### Conspiracy to Commit Hobbs Act Bribery
(Title 18, U.S.C. § 1951(a))

103.    The factual allegations of Paragraphs 1-4, 17-20, 22, 25, 34-37, and 46 of this

Indictment are hereby repeated, re-alleged and incorporated by reference as if fully set forth

herein.

### The Conspiracy

104.    Beginning in or around January 2009, and continuing through in or around

December 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants

EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI and others, did knowingly

and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and

affect commerce and the movement of articles and commodities in commerce by extortion; that

is, HILLS, a public official, obtained property not due to him or his office, from ALQSOUS,

AL-MADANI, their private clinics NDC and BFD, and others, with their consent, under color of

official right, in violation of Title 18, United States Code, Section 1951(a).

### Objects of the Conspiracy

105.    It was an object of the conspiracy that HILLS solicited and accepted from

ALQSOUS, AL-MADANI, their private clinics (NDC and BFD), and others, things of value, to

include cash, checks, a luxury briefcase, a large-screen television, apartment and hotel rentals,

concealment of the Oral Health Enrichment scheme, described below, meals, drinks, airline

flights and flight upgrades, and loans that were never repaid, to which HILLS was not entitled, in

return for HILLS using his official positions at MetroHealth and MetroHealth Dental to benefit

23

ALQSOUS, AL-MADANI, their private clinics (NDC and BFD), and others, both as requested and as opportunities arose.

106.    It was further an object of the conspiracy that HILLS, ALQSOUS, AL-MADANI and their co-conspirators concealed and attempted to conceal the bribes described in this Count of the Indictment from MetroHealth, the public and law enforcement.

Manner and Means

It was a part of the conspiracy that:

107.    Defendants SARI ALQSOUS and YAZAN B. AL-MADANI, and others, gave, offered and agreed to give things of value to Defendant EDWARD R. HILLS, to which he was not entitled, during the time that he was the Director of the MetroHealth Dental Department, Chief Operating Officer of MetroHealth, and interim Chief Executive Officer and President of MetroHealth, in exchange for HILLS taking favorable official actions to benefit ALQSOUS and AL-MADANI, both as requested and as specific opportunities arose.

108.    Beginning in or around January 2009, ALQSOUS and AL-MADANI, and others, secretly gave HILLS money and other things of value as follows:

*i.    Cash Payments*

109.    ALQSOUS, AL-MADANI and others gave HILLS cash, although HILLS served as their superior and supervisor at MetroHealth and MetroHealth Dental.  In an attempt to conceal the nature of these cash payments, ALQSOUS, AL-MADANI and others often gave the payments, and any discussions Defendants had regarding them, code words such as "thing," "something," "fundraisers," or "presents," and falsely tied the items to events such as HILLS' birthday or the winter holidays.  Specifically, ALQSOUS and AL-MADANI gave HILLS cash as described in the following paragraphs.

24

110.    From on or about December 13, 2011, and through on or about December 15, 2011, ALQSOUS and HILLS exchanged the following text messages:

<u>**HILLS**</u>                                    <u>**ALQSOUS**</u>

                                            got a little something
                                            for u
                                            - December 13, 2011

                                            Got something
                                            for u … are u at metro
                                            Tom
                                            - December 15, 2011

No I'm at offsite, I will
call U
-December 15, 2011

111.    On or about December 20, 2011, HILLS deposited approximately $2,000 in cash into his personal PNC Bank account, ending in 8152.

112.    From on or about December 26, 2011, through on or about December 28, 2011, HILLS and ALQSOUS exchanged the following text messages:

<u>**HILLS**</u>                                    <u>**ALQSOUS**</u>

                                            I told the guys about
                                            the fundraising …
                                            - December 26, 2011

that's not meeting
about, but glad u did
-December 26, 2011

Make sure all the
guys are at Pier W
tonight at 7, need to
see u earlier say 6
also what's up with
Noble
- December 28, 2011

                                            K I'll do that … I'll
                                            be there at 6 I'll tell u
                                            about chan tonight …

**HILLS**

**ALQSOUS**
Also I do have some
things for u
- December 28, 2011

113.    On or about December 30, 2011, HILLS deposited and caused to be deposited
approximately $1,000 in cash into his personal PNC Bank account ending in 8152.

114.    On or about January 3, 2012, and through on or about January 5, 2012, HILLS
and ALQSOUS exchanged the following text messages:

**HILLS**
"[******]8152"
[HILLS' personal
PNC Bank account
number]
- January 3, 2012

**ALQSOUS**

Running some
errands ... will do it
today tho
- January 3, 2012

Ok
- January 3, 2012

Goodmorning sir ...
have them on me ... le
me know when u have
time ... sorry, couldn't
make it to the bank ...
- January 4, 2012

U still at metro
- January 4, 2012

Come now
- January 4, 2012

Just checked my
account ... got a
little something for u
- January 5, 2012

**HILLS**                                               **ALQSOUS**
Ok, come by at 7:45,
have those shirts also
- January 5, 2012

115.    On or about February 1, 2012, ALQSOUS and HILLS exchanged the following

text messages:

**HILLS**                                               **ALQSOUS**
                                                        I talked to him and
                                                        he got it now ... I'll
                                                        see you tomo

Ok ... stop by at 8 am

                                                        On my way ...
                                                        someone broke my
                                                        escalade side mirror
                                                        made me run late

116.    On or about February 3, 2012, HILLS and ALQSOUS deposited and caused to be

deposited approximately $3,000 in cash into HILLS' personal PNC Bank account ending in

8152.

117.    On or about April 23, 2012, HILLS and ALQSOUS exchanged the following text

messages:

**HILLS**                                               **ALQSOUS**
                                                        Hey good news can
                                                        you meet me around
                                                        6pm

sure ... where

                                                        Crazy Horse 6:30 on
                                                        miles road

118.    On or about April 23, 2012, HILLS and ALQSOUS deposited and caused to be

deposited approximately $1,000 cash into HILLS' personal PNC Bank account ending in 8152.

119.   On or about August 9, 2012, ALQSOUS and AL-MADANI exchanged the

following text messages:

| **AL-MADANI** | **ALQSOUS** |
|---|---|
| We r invited for dinner in Strongsville | |
| | Then drop 500 us ur share of the dinner hahaha |

120.   On or about August 9, 2012, after the above-described text message exchange,

ALQSOUS and HILLS exchanged the following text messages:

| **HILLS** | **ALQSOUS** |
|---|---|
| | Are we still on do tonight or you want do it Tom … neither [CW 9] or madani can make it |
| I have [CW 9] need Yazan and yours, see you at MH tomorrow around 8ish | |
| | Ok boss you got it |

121.   On or about August 10, 2012, HILLS and ALQSOUS deposited and caused to be

deposited approximately $1,180 in cash into HILLS' personal PNC Bank account ending in

8152.

122.   On or about August 14, 2012, HILLS sent a text message to ALQSOUS, stating

"Just meet at Hyde Park downtown.  ALQSOUS replied, "Ok I'll tell [CW 9]."  ALQSOUS then

sent a text message to CW 9, stating "Downton Hyde park," and then sent another text message

to HILLS, stating, "I told [CW 9]."  Later on or about August 14, 2012, ALQSOUS sent a text

message to HILLS, asking, "U want talk outside."

123.    On or about August 15, 2012, HILLS and ALQSOUS deposited and caused to be deposited approximately $3,000 in cash into HILLS' personal PNC Bank account ending in 8152.

124.    On or about October 8, 2012, HILLS and ALQSOUS exchanged the following text messages:

| **HILLS** | **ALQSOUS** |
|---|---|
| see u at 8:45 my COO office | |
| | Ok … might run a little late … the bank opens at 8:30 |

125.    On or about October 9, 2012, HILLS and ALQSOUS deposited and caused to be deposited approximately $2,000 in cash into HILLS' personal PNC Bank account ending in 8152.

126.    On or about October 22, 2012, two days before HILLS' birthday that year, MetroHealth Employee #1, a person known to the Grand Jury, sent ALQSOUS a text message, stating, "call me asap."  Later that same day, ALQSOUS and AL-MADANI exchanged the following text messages with one another and CW 9:

| **AL-MADANI** | **ALQSOUS** |
|---|---|
| | [MetroHealth Employee #1] called, we'll pay 100 for every year … 520 |
| F*k u for this nice info early in the morning | |
| | U r welcome |

127.    On or about November 6, 2012, ALQSOUS sent a text message to CW 9, stating "At 6 with hills … he just called … Ill send you the address of the restaurant … 25550 chagrin boulevard beachwood 216[XXX-XXXX]."  Later that day, HILLS and ALQSOUS deposited

and caused to be deposited approximately $1,763.50 in cash into HILLS' personal PNC Bank account ending in 8152.

128. On or about March 25, 2013, ALQSOUS sent a text message to HILLS asking, "Can I pass by now?" Later that day, HILLS and ALQSOUS deposited and caused to be deposited approximately $1,000 in cash into HILLS' personal PNC Bank account ending in 8125.

129. On or about April 23, 2013, CW 9 purchased a United Airlines ticket for HILLS, for approximately $468, for HILLS' travel to San Francisco, California.

130. On or about June 7, 2013, ALQSOUS sent a text message to his fiancé, stating "hills want to grab a drink."

131. On or about June 11, 2013, HILLS and ALQSOUS deposited and caused to be deposited approximately $1,000 in cash into HILLS' personal PNC Bank account ending in 8152.

132. On or about October 7, 2013, ALQSOUS sent a text message to AL-MADANI and CW 9, stating, "With 22nd of October approaching we ll be celebrating Dr hills bday earlier this year…1000 dollars each that is the gift from the 3 sons their father." Later that day, HILLS, ALQSOUS and AL-MADANI deposited and caused to be deposited approximately $3,000 in cash into HILLS' personal PNC Bank account ending in 8152.

133. On or about January 7, 2014, ALQSOUS sent a text message to AL-MADANI, stating, "Will give 1000 pay roll instead of the 1000 for hills." On or about that same day, ALQSOUS and AL-MADANI issued and caused to be issued an NDC business check, made payable to HILLS, for approximately $1,100, with a memo line stating, "consultation fees."

134.    On or about the dates listed below, ALQSOUS, AL-MADANI and others deposited and caused to be deposited the amounts listed below into HILLS' personal PNC Bank account ending in 8152, by depositing said funds into a PNC Bank branch located in Rocky River, Ohio, approximately two miles away from AL-MADANI's residence, and over 40 miles away from HILLS' residence in Aurora, Ohio:

| Act | Approximate Date | Approximate Amount Deposited into HILLS' Personal PNC Bank Account ending in 8152 |
|-----|------------------|-----------------------------------------------------------------------------------|
| a. | September 6, 2013 | $2,000 cash deposit |
| b. | February 20, 2014 | $1,000 cash deposit |
| c. | March 4, 2014 | $1,000 cash deposit |
| d. | September 18, 2014 | $1,900 cash deposit |

*ii.    Payments and Things of Value for HILLS' Designees*

135.    HILLS demanded, solicited and obtained money and goods and services from ALQSOUS, AL-MADANI and others, for his designees.  ALQSOUS, AL-MADANI and others agreed to make these payments, and purchased goods and services for HILLS' designees, as requested, as follows:

A.    Apple Notebook Computer for Designee 1

136.    In or around mid-2012, HILLS began a relationship with Designee 1, an individual known to the Grand Jury.

137.    In or around mid-2012, Designee 1 informed HILLS that she would start attending law school in Fall 2012.  HILLS offered to purchase a notebook computer for Designee 1 to assist her with law school.

138.    From on or about July 30, 2012, through on or about August 7, 2012, HILLS and ALQSOUS exchanged the following text messages about obtaining an Apple notebook computer for Designee 1:

| **HILLS** | **ALQSOUS** |
|---|---|
| Guys I would like to have a fundraiser for a Apple Computer tomorrow at Hyde Park in Beachwood tomorrow at 6pm<br>-July 30, 2012 | |
| | What do u want to raise and I'll do it<br>-July 31, 2012 |
| Apple notebook plus accessory around 2g<br>-July 31, 2012 | |
| Tried to call U, call ur guy about the Apple and I need some [Certain prescription medication]<br>-August 7, 2012 | |
| | I will call the guy now and will call [CW 9] to call me a script … I talked to the guys about the apple madani said he ll talk to you, I got little something for you too, we can met for a drink at johnies after work ?<br>-August 7, 2012 |

139.    In or around August 2012, ALQSOUS, AL-MADANI and CW 9 provided HILLS with funds to purchase an Apple notebook computer for Designee 1.

140.    In or around August 2012, HILLS provided the funds he received from ALQSOUS, AL-MADANI and CW 9 to Designee 1 to reimburse her for the purchase of an Apple notebook computer.

B.    Free Apartment for Designee 1

141.    In or around late 2012, ALQSOUS rented and lived in an apartment in downtown Cleveland, Ohio, at the Perry Payne apartment building ("the Perry Payne apartment.")  At or around this time, ALQSOUS purchased a residence in Cleveland, Ohio, and began the process of moving from the Perry Payne apartment and into his new residence.

142.    In or around late 2012, HILLS instructed ALQSOUS to keep paying the rent, utilities, cable and internet bills on the Perry Payne apartment, even though ALQSOUS would no longer be living there.  At or around this time, HILLS further instructed ALQSOUS to purchase furniture for the Perry Payne apartment for HILLS' personal use.

143.    On or about January 25, 2013, ALQSOUS sent a text message to HILLS, stating, "I bought your bedroom yesterday ... there is mirrors everywhere .... You will like it."

144.    On or about the dates listed below, ALQSOUS and HILLS exchanged the following text messages concerning the Perry Payne apartment and making it available for HILLS' and Designee 1's use:

| **HILLS** | **ALQSOUS** |
|---|---|
| What's the apartment # <br> -March 10, 2013 | |
| | 304 ... fob for the main door and key for the apartment <br> -March 10, 2013 <br> Let me know when u heading there <br> -March 14, 2013 |
| [Designee 1] 216 [XXX-XXXX] check her in under her name one night <br> -March 14, 2013 | |

33

**HILLS**

**ALQSOUS**

Can you bring the keys
Tom with you so They
can go do the tv and
internet
-March 25, 2013

Ok
-March 25, 2013

740 w superior ave
Cleveland, Ohio 304
Apt 304
-April 9, 2013

Took care of the painter
already ... still ddn't
hear back from Michael
-April 10, 2013

216-[XXX-XXXX]
Michael tell him that
your calling for me,
need Olga to clean Apt
Thursday, probably 2
hrs, if he can't get
Olga then someone,
emphasis on the
bathroom, kitchen
(frige) also vacuum
and dust and window
clean.  What's up with
the painter??
-April 10, 2013

I'll do that today and
call the maintenance
department go the
condo and make them
do it ASAP
-April 10, 2013

Do it this morning
early !!
-April 10, 2013

| **HILLS** | **ALQSOUS** |
|---|---|
| | Ok they open at 9 will call them at 9:00<br>-April 10, 2013 |
| Call Michael now<br>-April 10, 2013 | |
| | Ok<br>-April 10, 2013 |
| You need to tell maintenance guy you willing to throw him a 100 to get it done by end day today<br>-April 10, 2013 | |
| | I'm getting ur new keys … you didn't find them right<br>-April 25, 2013 |
| Call me<br>-April 25, 2013 | |
| | Got the keys for you<br>-April 25, 2013 |
| I need key<br>-April 26, 2013 | |
| | On my way need like 15 min<br>-April 26, 2013 |

145.    In or around March 2013, ALQSOUS moved out of the Perry Payne apartment and into his new residence in Cleveland, Ohio.

146.    On or about the dates listed below, ALQSOUS, acting under HILLS' orders, continued to pay rent, utilities, cable and internet bills for the Perry Payne apartment, although ALQSOUS no longer lived in or used the Perry Payne apartment:

35

| APPROXIMATE DATE | DESCRIPTION | APPROXIMATE AMOUNT |
|---|---|---|
| March 18, 2013 | Cable/Internet | $120 |
| April 4, 2013 | Rent | $1,000 |
| May 8, 2013 | Rent | $1,035 |
| May 16, 2013 | Cable/Internet | $209.71 |
| June 11, 2013 | Cable/Internet | $97.03 |
| June 12, 2013 | Rent | $1,035 |
| July 1, 2013 | Rent | $1,000 |
| August 5, 2013 | Rent | $1,035 |
| August 15, 2013 | Cable/Internet | $97.03 |
| September 5, 2013 | Rent | $1,025 |
| September 15, 2013 | Cable/Internet | $97.16 |
| October 5, 2013 | Rent | $1,025 |
| October 15, 2013 | Cable/Internet | $97.16 |
| November 6, 2013 | Rent | $1,025 |
| December 5, 2013 | Rent | $1,025 |
| January 3, 2014 | Cable/Internet | $321.48 |

147.    From in or around March 2013 and through in or around January 2014, HILLS used the Perry Payne apartment to house Designee 1, and for his own personal use, and did not at any time reimburse ALQSOUS for the cost of renting or maintaining the Perry Payne apartment.

C.    Travel, Hotels and Car Repairs for HILLS' Designees

148.    On or about the dates listed below, ALQSOUS, AL-MADANI, CW 9 and others, acting at HILLS' instructions, purchased: airplane tickets and baggage fees for HILLS and Designee 1 for trips that HILLS and Designee 1 took either separately or together, and that HILLS took to visit Designee 1 while she was in law school; hotel stays for Designee 1; and car repairs for Designee 2:

| APPROXIMATE DATE | DESCRIPTION | APPROXIMATE AMOUNT |
|---|---|---|
| February 14, 2013 | United Airlines ticket for HILLS for trip from Cleveland, Ohio, to San Francisco, California | $1,022 |
| April 24, 2013 | United Airlines ticket for HILLS for trip from Cleveland, Ohio, to San Francisco, California | $468 |
| July 8, 2013 | Southwest Airlines ticket for Designee 1 for trip from Cleveland, Ohio, to New Orleans, | $746.60 |

| APPROXIMATE DATE | DESCRIPTION | APPROXIMATE AMOUNT |
|---|---|---|
| | Louisiana | |
| September 26, 2013 | U.S. Airways ticket and baggage fees for Designee 1 for trip from Raleigh, North Carolina, to Cleveland, Ohio | $473.10 (airplane ticket) $25 (baggage fee) |
| January 24, 2014 | Car repairs for Designee 2 | $1,664.24 |
| February 27, 2014 | U.S. Airways ticket for HILLS for trip from Akron, Ohio, to Charlotte, North Carolina | $632.50 |
| May 19 – 27, 2014 | Hotel Stay for Designee 1 at the Wyndham Hotel, Cleveland, Ohio | $1,677.49 |

*iii.* *Prescriptions*

149. ALQSOUS, AL-MADANI and others also wrote prescriptions for HILLS for medications and provided prescription pills to HILLS and HILLS' designees as follows:

150. On or about March 27, 2012, HILLS sent a text message to ALQSOUS, stating, "lets meet at 6pm today at XO tell [CW 9] … also bring me a [certain prescription medication]." ALQSOUS replied, "Ok boss."

151. On or about April 17, 2012, HILLS and ALQSOUS exchanged the following text messages:

**HILLS**                                                 **ALQSOUS**
No never had bottle you
gave me a envelope but
they can look up by name
and bday [DOB]

Where are my meds

                                              On my way

                                              Do you want me to
                                              come to your office

yes

152. On or about April 27, 2012, HILLS sent a text message to ALQSOUS with the instruction, "Sary call Walgreens 216[XXX-XXXX] [a certain prescription medication] 5mg

37

once a day for [Designee 3, a person known to the Grand Jury and a designee of HILLS] [DOB] home # 216[XXX-XXXX] my DEA expired call me when your done."

153.    On or about May 12, 2012, HILLS sent a text message to ALQSOUS, instructing him to "Call in [a certain prescription medication] 500 mg for [Designee 4, a person known to the Grand Jury and a designee of HILLS] dob [XX/XX/XX] pharmacy #330[XXX-XXXX]." ALQSOUS responded, "Just called it in ... u sounded sick let me know if you need anything."

154.    On or about June 23, 2012, HILLS and ALQSOUS exchanged the following text messages:

| HILLS | ALQSOUS |
|---|---|
| Hey call me when ur done, also have Yazan call in some [a certain prescription medication] (6) 20mg for U at Aurora CVS I will pick up make sure ur insurance on record he should give a rear refill, store #330[XXX-XXXX]?? Please chek# only CVS in Aurora Oh | |
| | I'll do that |

155.    On or about August 2, 2012, HILLS and ALQSOUS exchanged the following text messages with one another:

| HILLS | ALQSOUS |
|---|---|
| Need you to call CVS in Tampa [a certain prescription medication] 813[XXXXXX] please due it ASAP Edward Hills [DOB] [XXXXX] Deer Island Drive Aurora OH [XXXXX] | |

| **HILLS** | **ALQSOUS** |
|---|---|
| | Done |

156.    On or about August 8, 2012, HILLS and ALQSOUS exchanged the following text messages:

| **HILLS** | **ALQSOUS** |
|---|---|
| Hope u got my pills!!! | |
| | [CW 9] called it for me ... will pick it up after work ... see u at dinner |

157.    On or about August 30, 2012, HILLS sent a text message to ALQSOUS, stating, "Be at Mortons 7:30 tonight, bring pills," to which ALQSOUS replied, "Ok."

*iv.    Down Payment for MetroHealth Employee 1's House*

158.    In or around Summer 2012, MetroHealth Employee 1 was attempting to purchase a second house in Pepper Pike, Ohio.  In order to make the purchase, MetroHealth Employee 1 needed to make a down payment of approximately $5,000.

159.    In or around August 2012, HILLS instructed ALQSOUS, AL-MADANI and CW 9 to provide him with approximately $5,000 to help make the down payment on the house that MetroHealth Employee 1 was purchasing in Pepper Pike, Ohio.

160.    On or about August 4, 2012, MetroHealth Employee 1 purchased an approximately $5,000 cashier's check for the down payment on her Pepper Pike residence.

161.    On or about August 6, 2012, HILLS deposited approximately $5,000 into his personal PNC Bank account ending in 8152.

162.    In or around Fall 2012, HILLS gave MetroHealth Employee 1 the $5,000 to reimburse her for the down payment she made on the Pepper Pike residence.

v.    *Louis Vuitton Briefcase*

163.    In or around December 2012, HILLS became the interim-Chief Executive Officer and President of the MetroHealth Hospital System.

164.    In or around December 2012, HILLS told ALQSOUS, AL-MADANI and others, that he wanted a specific Louis Vuitton briefcase because his predecessor at MetroHealth had a similar briefcase.

165.    On or about December 18, 2012, ALQSOUS sent a text message to HILLS, stating, "Gonna go check the bags LV at beachwood, the ones online are like 2700, is this the price range u talked about."

166.    On or about January 1, 2013, ALQSOUS and HILLS exchanged the following text messages with one another:

| **HILLS** | **ALQSOUS** |
|---|---|
| | got the guys together to deliver your gift to start ur new job… |
| | This is the one? [Accompanied by a picture of a Louis Vuitton briefcase] |
| Yes | |
| | The guys are also very excited about their raise haha |
| Thanks I'm so excited to have my bag to start my new job as #1 | |
| | You are welcome, it is an honor |
| Thanks it is like having | |

40

**HILLS**                                                                    **ALQSOUS**
3 sons

167.    On or about January 1, 2013, ALQSOUS, AL-MADANI and others purchased a Louis Vuitton briefcase, for approximately $3,879, from a Saks Fifth Avenue department store in Beachwood, Ohio.

168.    In or around January 2013, ALQSOUS, AL-MADANI and others presented HILLS with the Louis Vuitton briefcase.

*vi.     55-Inch Large-Screen Television*

169.    In or around December 2013, HILLS instructed ALQSOUS, AL-MADANI and others to purchase a large-screen, LED television for HILLS for Christmas.

170.    In or around December 2013, ALQSOUS and AL-MADANI agreed to provide funds to CW 9 for the purchase of a 55-inch LED television for HILLS.

171.    On or about December 31, 2013, ALQSOUS gave CW 9 a personal check for approximately $1,500 with "TV for Dr. Hills" written in the memo line.

172.    On or about January 6, 2014, ALQSOUS, AL-MADANI and CW 9 purchased a 55-inch LED television for HILLS from a Best Buy store in the Northern District of Ohio, for approximately $3,000. ALQSOUS, AL-MADANI and CW 9 further paid approximately $556.35 for the delivery and installation of the television in HILLS' house in Aurora, Ohio.

173.    The payments and other things of value described above in Paragraphs 109-172 of this Indictment were made to influence and reward HILLS for using his position at MetroHealth and MetroHealth Dental to take and agree to take favorable official action, both as requested and as specific opportunities arose, to benefit ALQSOUS, AL-MADANI and others. Among others, HILLS took the below described favorable actions in return for receiving this stream of financial benefits from his co-conspirators.

A.    **Increased Monthly Bonuses**

174.    Attending Dentists at MetroHealth Dental, in addition to their salary, were offered incentive or bonus payments on a monthly basis.  These bonus payments were generally determined by considering the dentist's monthly productivity in terms of receipts generated per month, compared with that dentist's monthly guaranteed salary and benefits.  If the dentist produced more receipts in a month than their monthly salary and benefits, they were entitled to an incentive payment of approximately 25% of their excess receipts.  As director of the MetroHealth Dental Department, HILLS had discretion in determining the actual monthly bonuses to be paid to the Attending Dentists in the department and could adjust an individual dentist's incentive payments despite the 25% formula for excess receipts.

175.    In or around the following months, the exact dates being unknown to the Grand Jury, HILLS, in excess of the 25% formula, did upwardly adjust the incentive payments made by MetroHealth to ALQSOUS, AL-MADANI and CW 9 as follows:

| Month | Dentist | Approximate Calculated Incentive | Approximate Actual Incentive | Approximate Adjustment by HILLS |
|---|---|---|---|---|
| August 2010 | AL-MADANI | $4,094 | $7,000 | $2,906 |
| March 2011 | ALQSOUS | $4,421 | $5,400 | $979 |
| April 2011 | ALQSOUS | $7,218 | $8,178 | $960 |
| November 2011 | ALQSOUS | $5,446 | $10,000 | $4,554 |
| February 2012 | AL-MADANI | $3,800 | $5,800 | $2,000 |
| February 2012 | ALQSOUS | $8,881 | $13,881 | $5,000 |
| March 2012 | ALQSOUS | $7,603 | $9,603 | $2,000 |
| May 2012 | ALQSOUS | $15,500 | $17,700 | $2,200 |
| June 2012 | ALQSOUS | $15,225 | $15,725 | $500 |
| July 2012 | ALQSOUS | $17,022 | $17,772 | $750 |
| August 2012 | ALQSOUS | $15,863 | $17,863 | $2,000 |
| September 2012 | ALQSOUS | $14,592 | $15,342 | $750 |
| October 2012 | ALQSOUS | $13,819 | $16,819 | $3,000 |
| November 2012 | AL-MADANI | $8,833 | $10,000 | $1,167 |
| November 2012 | ALQSOUS | $14,138 | $15,138 | $1,000 |
| November 2012 | CW 9 | $2,939 | $10,000 | $7,061 |
| December 2012 | AL-MADANI | $7,453 | $17,453 | $10,000 |

| Month | Dentist | Approximate Calculated Incentive | Approximate Actual Incentive | Approximate Adjustment by HILLS |
|---|---|---|---|---|
| December 2012 | ALQSOUS | $17,135 | $17,385 | $250 |
| December 2012 | CW 9 | $2,697 | $12,697 | $10,000 |
| January 2013 | AL-MADANI | $6,299 | $19,017 | $12,718 |
| January 2013 | ALQSOUS | $11,288 | $12,538 | $1,250 |
| January 2013 | CW 9 | $6,961 | $11,366 | $4,405 |
| February 2013 | ALQSOUS | $12,922 | $14,172 | $1,250 |
| March 2013 | ALQSOUS | $7,852 | $10,602 | $2,750 |
| April 2013 | ALQSOUS | $14,642 | $16,642 | $2,000 |
| May 2013 | ALQSOUS | $13,040 | $15,540 | $2,500 |
| June 2013 | ALQSOUS | $11,380 | $12,880 | $1,500 |
| July 2013 | ALQSOUS | $12,332 | $13,832 | $1,500 |
| August 2014 | AL-MADANI | $8 | $2,008 | $2,000 |
| September 2014 | AL-MADANI | $(250) | $1,225 | $1,500 |
| October 2014 | AL-MADANI | $621 | $3,000 | $2,379 |
| **TOTAL** | | **$283,774** | **$376,578** | **$92,829** |

**B.**  **Allowing ALQSOUS, AL-MADANI and CW 9 to Work Part-Time Hours but Remain Full-Time MetroHealth Employees**

176.  HILLS allowed ALQSOUS, AL-MADANI and CW 9 to retain their full-time salaries as Attending Dentists without requiring them to work a full-time schedule at MetroHealth, thus allowing them to work partial weeks and to operate private clinics while paid full-time wages by MetroHealth.

**C.**  **Free MetroHealth Resident Labor at Noble Dental Clinic and Buckeye Family Dental**

177.  In or around April 2013, ALQSOUS and AL-MADANI purchased Noble Dental Clinic from CW 8.

178.  In or around April 2013, AL-MADANI and ALQSOUS opened operations at Buckeye Family Dental.

179.  From in or around April 2013 through in or around December 2014, HILLS, at ALQSOUS' and AL-MADANI's request, agreed to provide MetroHealth Resident Dentists to practice at NDC and BFD on a part-time basis and during regular business hours.

43

180.    Neither ALQSOUS nor AL-MADANI paid wages or salary to the MetroHealth Resident Dentists working at NDC and BFD.

181.    The MetroHealth Resident Dentists who worked at NDC and BFD under ALQSOUS and AL-MADANI continued to receive salary and wages from MetroHealth, while they were also working at NDC and BFD on ALQSOUS' and AL-MADANI's behalf.

182.    The MetroHealth Resident Dentists continued to practice dentistry at BFD and NDC, using the malpractice insurance they received from MetroHealth, even though they were not allowed to practice in a non-MetroHealth facility under that insurance.

183.    From in or around April 2013 through in or around December 2014, HILLS, ALQSOUS and AL-MADANI concealed from MetroHealth officials and the MetroHealth Board of Trustees the fact that they were using MetroHealth resources, in the form of MetroHealth-paid resident dentists, during regular business hours, for the benefit of BFD and NDC.

### D.    Admission of Resident Dentist 1 to the MetroHealth Dental Residency Program

184.    Resident Dentist 1 ("RD 1"), a foreign-trained dentist, had known ALQSOUS prior to applying to the MetroHealth Dental residency program.

185.    In or around Fall 2013, RD 1 applied to the MetroHealth Dental residency program.

186.    From in or around November 2013 through in or around December 2013, RD 1 participated in the interview process for the MetroHealth Dental residency program.

187.    In or around December 2013, evaluators in the MetroHealth Dental residency program decided to select candidates, other than RD 1, for the residency program.

188.    In or around December 2013, HILLS asked a MetroHealth Attending Dentist, known to the Grand Jury, why RD 1 was not selected to be in the residency program. The

Attending Dentist showed HILLS the scores for RD 1, which were calculated to be lower than other candidates, who also were not selected.

189.    In or around January 2014, RD 1 was informed that he was not selected for the MetroHealth Dental residency program.

190.    In or around February 2014, HILLS instructed CW 9 and another MetroHealth Attending Dentist to create an "off-year" position for a new resident dentist. HILLS further instructed CW 9 to select "Sari's boy," RD 1, over the other, higher ranked candidates.

191.    In or around February 2014, HILLS authorized employment and acceptance papers for RD 1's employment as a MetroHealth Resident Dentist.

192.    The conspirators further took steps to hide, conceal and cover-up their activity and the nature and scope of their corrupt relationship with one another.

All in violation of Title 18, United States Code, Section 1951(a).

The Grand Jury further charges:

## COUNT 3
Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds;
*The Dental Residency Bribery Scheme*
(Title 18, U.S.C. § 371)

General Allegations:

193.     The factual allegations of Paragraphs 1-3, 14-18, 22-23, 25-26, 28-29, 38-42 and 46 of this Indictment are hereby repeated, re-alleged and incorporated by reference as if fully set forth herein.

194.     MetroHealth Dental sponsored a competitive dental residency program, accredited by the Ohio State Dental Board, to train prospective dentists ("Resident Dentists") under the guidance of Attending Dentists.  The MetroHealth Dental residency program received approximately 40 to 60 applications from Resident Dentist candidates on an annual basis.  From these applications, approximately 20 to 30 candidates were invited to participate in a panel interview with MetroHealth Dental Attending Dentists and current Resident Dentists.  Of the interviewed candidates, approximately four to six were ultimately selected for that year's residency program.  The current Attending Dentists and Resident Dentists conducted the panel interviews of Resident Dentist candidates and made recommendations to the MetroHealth Dental Department Director.  Attending Dentists also served in a supervisory role to Resident Dentists in the program.

195.     As Attending Dentists at MetroHealth Dental, Defendants SARI ALQSOUS, TARIQ SAYEGH and YAZAN B. AL-MADANI each had the authority to influence the selection of Resident Dentists in the MetroHealth Dental residency program, and approve and establish job duties of Resident Dentists.

46

196.    As Director of MetroHealth Dental, Edward R. Hills could override selections for the residency program and had final decisional authority to determine which Resident Dentist candidates were selected for the program.

197.    MetroHealth and MetroHealth Dental received over $10,000 in federal funds for each of the calendar years material to this count of the indictment.

198.    Defendant SARI ALQSOUS was an agent of MetroHealth as defined in Title 18, United States Code, Section 666(d)(1).

199.    Defendant TARIQ SAYEGH was an agent of MetroHealth as defined in Title 18, United States Code, Section 666(d)(1).

200.    Defendant YAZAN AL-MADANI was an agent of MetroHealth as defined in Title 18, United States Code, Section 666(d)(1).

## THE CONSPIRACY

201.    From in or around January 2008 and continuing through to in or around December 2014, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants SARI ALQSOUS, TARIQ SAYEGH and YAZAN AL-MADANI, acting as agents of MetroHealth and MetroHealth Dental, and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit an offense against the United States, that is, bribery concerning programs receiving federal funds, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and (a)(2).

## OBJECTS OF THE CONSPIRACY

202.    The objects of the conspiracy were for Defendants SARI ALQSOUS, TARIQ SAYEGH, YAZAN B. AL-MADANI and others to corruptly solicit, demand and accept things

47

of value for the benefit of ALQSOUS, SAYEGH, AL-MADANI and Hills, intending that,

ALQSOUS, SAYEGH and AL-MADANI be influenced and rewarded in connection with a

business, transaction and series of transactions of MetroHealth and MetroHealth Dental valued at

$5,000 or more in the 2008 through 2014 calendar years, respectively, that is, the selection of

Resident Dentist positions in the MetroHealth Dental residency program, continued employment

in the MetroHealth Dental residency program and to receive and continue to receive payments in

return for the selection and continued employment of Resident Dentists at MetroHealth.  The

things of value included, among others, cash, checks and tangible items for ALQSOUS,

SAYEGH, AL-MADANI and Hills.

  203. It was further an object of the conspiracy that ALQSOUS, SAYEGH, AL-

MADANI and their co-conspirators sought to promote their financial goals by concealing,

attempting to conceal and encouraging others to conceal from MetroHealth, the public and law

enforcement their corrupt relationship with one another and their solicitation of bribes from

resident dentist candidates, and to maintain their employment at MetroHealth so that they could

continue to solicit bribes from future resident dentist candidates.

MANNER AND MEANS

  It was a part of the conspiracy that:

  204. ALQSOUS, SAYEGH and AL-MADANI, as agents of MetroHealth and

MetroHealth Dental, served on panels interviewing Resident Dentist candidates for the

MetroHealth Dental residency program.

  205. ALQSOUS, SAYEGH and AL-MADANI sometimes shared information about

potential candidates for the MetroHealth Dental residency program.

48

206.   ALQSOUS, SAYEGH and AL-MADANI, knowing certain MetroHealth Dental residency candidates' ethnic and national backgrounds, identified and selected candidates who were either from Jordan or trained at a Jordanian dental school, from whom to solicit and accept bribes, payments and things of value in order to be accepted into the MetroHealth Dental residency program.

207.   In certain instances, ALQSOUS and SAYEGH offered to host Resident Dentist candidates from Jordan, or those trained at Jordanian dental schools, as those candidates visited MetroHealth Dental before applying to the MetroHealth Dental residency program.

208.   In some cases, ALQSOUS and SAYEGH, using their positions of authority at MetroHealth Dental and their involvement in the Resident Dentist interview process, corruptly solicited and accepted bribes, payments and things of value from Resident Dentist candidates who were Jordanian nationals or trained at Jordanian dental schools.

209.   ALQSOUS and SAYEGH told certain dental residency candidates that they would have to pay a "donation" to MetroHealth and MetroHealth Dental in order to receive favorable consideration for their residency applications.

210.   In those cases where they told a dental residency candidate to pay a "donation" to MetroHealth and MetroHealth Dental, ALQSOUS and SAYEGH directed dental residency candidates to pay the "donation" directly to them rather than to MetroHealth or MetroHealth Dental.

211.   In some cases, ALQSOUS and SAYEGH also characterized the "donation" and bribe payment as a "loan," which had no terms of repayment and were never repaid by ALQSOUS and SAYEGH.

212.    In certain cases, ALQSOUS, SAYEGH and AL-MADANI touted their access to and relationship with Hills as evidence of their power to get the residency candidates into the program, and to encourage residency candidates to pay bribes to get into the program.

213.    In some cases, ALQSOUS and SAYEGH also told the dental residency candidates that a portion of their "donation" would go to Hills, who was the director of MetroHealth Dental and a high-ranking official at MetroHealth.

214.    In certain instances, ALQSOUS and SAYEGH told Dental Resident candidates that they would pay or had paid the entire "donation," or a portion of the "donation," on the candidate's behalf, and that the candidate would then have to pay ALQSOUS and SAYEGH in return for the payment.

215.    In some cases, ALQSOUS and SAYEGH offered to "discount" the "donation" to a lesser amount in order to entice the dental resident candidate to pay them.

216.    ALQSOUS and SAYEGH arranged for the dental resident candidates to make payments by wire transfers, checks and cash.  In certain instances, SAYEGH arranged for the dental resident candidate to make payments to SAYEGH's relative in Jordan.

217.    ALQSOUS and SAYEGH, knowing that they had corruptly solicited and accepted bribes, payments and things of value, acted and encouraged each other and others known and unknown to the Grand Jury to perform official acts related to the selection of MetroHealth Dental Resident Dentists to benefit their interests and those of the candidates who made the bribe payments, or from whom they hoped to extract future payments.

218.    In some cases, after a Jordanian national or trained Resident Dentist candidate was accepted into the MetroHealth Dental program, ALQSOUS and SAYEGH continued to corruptly solicit, accept and receive bribes, payments and things of value from those candidates

during their dental residencies, in exchange for their continued employment and favorable treatment in the program.

219.  In one case where the Resident Dentist candidate rejected the solicitation but was nevertheless selected into the MetroHealth Dental residency program, ALQSOUS attempted to make that candidate work extra hours and weekends without pay although other residents were not required to work similar hours, and attempted to terminate that candidate's employment.

220.  ALQSOUS, SAYEGH and AL-MADANI told Resident Dentist candidates not to discuss their "donations" with any other officials at MetroHealth.  In certain instances, ALQSOUS, SAYEGH, AL-MADANI and Hills pressured Resident Dentist candidates to not discuss their solicitations of "donations" regarding the MetroHealth Dental residency program, and threatened certain Jordanian Resident Dentists that they would be deported if they informed law enforcement officials about the resident bribery scheme.

OVERT ACTS

221.  In furtherance of the conspiracy and to effect the objects thereof, ALQSOUS, AL-MADANI, SAYEGH and other co-conspirators known and unknown to the Grand Jury committed the following overt acts, among others, in the Northern District of Ohio and elsewhere:

*Bribes Solicited from CW 1*

222.  In or around Fall 2008, ALQSOUS and SAYEGH invited Cooperating Witness 1 ("CW 1"), a Jordanian national and trained dentist, to stay at their shared residence in the Cleveland, Ohio, metropolitan area in anticipation of CW 1's application to the MetroHealth Dental residency program.

51

223. On or about October 29, 2008, ALQSOUS sent an email to CW 1 in connection with CW 1's application to the MetroHealth Dental Residency program, and advised him, "I think I can get you in next year with a donation 100%."

224. In or around October 2008, ALQSOUS and CW 1 agreed that CW 1 would give approximately $15,000 to ALQSOUS, in return for assisting CW 1 in gaining acceptance into the MetroHealth Dental residency program, by sending wire transfers to ALQSOUS' PNC bank account as follows: A) approximately $5,000 to be sent to ALQSOUS after CW 1 submitted an application to the MetroHealth Dental residency program; B) approximately $5,000 to be sent to ALQSOUS after CW 1 participated in a panel interview for the MetroHealth Dental residency program; and C) approximately $5,000 to be sent to ALQSOUS after CW 1 was accepted into the residency program.

225. On or about November 1, 2008, ALQSOUS sent an email to CW 1 providing ALQSOUS' bank account information at National City Bank for CW 1 to send him a wire payment in connection with CW 1's application to the MetroHealth Dental residency program.

226. On or about November 5, 2008, CW 1 sent and caused to be sent a wire transfer of approximately $5,000 from a bank account at the Cairo Amman Bank in Jordan to ALQSOUS' National City Bank account in the Northern District of Ohio.

227. On or about January 2, 2009, CW 1's relative wired approximately $4,973 from a bank account at the Cairo Amman Bank in Jordan to ALQSOUS' National City Bank account in the Northern District of Ohio.

228. On or about March 6, 2009, CW 1's relative wired an additional approximately $4,970 from a bank account at the Cairo Amman Bank in Jordan to ALQSOUS' PNC Bank account in the Northern District of Ohio.

229.    In or around Summer 2009, after CW 1 began a dental residency at MetroHealth Dental, ALQSOUS told CW 1 that ALQSOUS paid the remaining $5,000 of CW 1's "donation" on CW 1's behalf. ALQSOUS further told CW 1 that he borrowed approximately $2,500 from SAYEGH, and that CW 1 owed both ALQSOUS and SAYEGH $2,500, each, for their payments.

230.    On or about June 10, 2009, Hills signed a new hire document on behalf of MetroHealth for CW 1.

231.    On or about July 23, 2009, ALQSOUS deposited into his PNC Bank account a check for approximately $2,500, written by CW 1 and made payable to ALQSOUS.

*Bribes Solicited from CW 2*

232.    Between in or around Summer 2010 and in or around December 2010, SAYEGH invited Cooperating Witness 2 ("CW 2"), a Jordanian national and trained dentist, to stay with him at his Cleveland, Ohio, area residence to conduct an observation of the MetroHealth Dental residency program.

233.    Between in or around Summer 2010 and in or around December 2010 SAYEGH solicited CW 2 for a $15,000 "donation" to assist CW 2's application and acceptance into the MetroHealth Dental residency program.

234.    In or around early 2011, SAYEGH caused CW 2's family to give approximately $10,000 in cash, taken from the proceeds of an earlier land sale, to SAYEGH's relative in or around Madaba, Jordan.

235.    In or around early 2011, ALQSOUS took an official action and ranked CW 2's residency application higher than other candidates.

236.    In or around early 2011, before CW 2 was officially notified of being accepted into the MetroHealth Dental residency program, AL-MADANI sent CW 2 a message congratulating CW 2 on CW 2's acceptance into the dental residency program.

237.    In or around mid-2014, after becoming aware of a potential FBI investigation into allegations of bribery solicitation at MetroHealth Dental, AL-MADANI approached CW 2 and said that CW 2 should not say anything about the bribery conduct if interviewed by law enforcement, and that it was possible CW 2 could be deported if CW 2 spoke with law enforcement.

*Bribes Solicited from CW 3*

238.    In or around November 2010, AL-MADANI participated in a panel interview of Cooperating Witness 3 ("CW 3"), a Jordanian national and trained dentist, who AL-MADANI previously knew from Jordan, for a position in the MetroHealth Dental residency program.

239.    In or around December 2010 SAYEGH placed a telephone call to CW 3 in Jordan and requested a $20,000 "donation" for "research" in order to assist CW 3's application and acceptance into the MetroHealth Dental residency program.

240.    Between in or around January 2011 and in or around June 2011, SAYEGH caused CW 3's relative to withdraw approximately $5,000 from a bank account in Jordan for CW 3 to give to SAYEGH's brother in response to SAYEGH's solicitation of a "donation."

241.    Between in or around January 2011 and in or around June 2011, SAYEGH called CW 3 again and asked about the "donation."

242.    Between in or around January 2011 and in or around June 2011, after the phone call referenced in Paragraph 241, above, and before CW 3 began his residency at MetroHealth Dental, SAYEGH called CW 3 again and asked a second time about the "donation."

243.    Between in or around January 2011 and June 2011, SAYEGH caused CW 3 and CW 3's family members to make a payment of approximately $5,000 to SAYEGH's relative in Jordan.

244.    Between in or around January 2011 and June 2011, after the payment referenced in Paragraph 243, above, SAYEGH caused CW 3 and CW 3's relatives to make a second payment of approximately $5,000 to SAYEGH's relative in Jordan.

245.    In or around November 2012, while CW 3 was still a Resident Dentist at MetroHealth Dental, SAYEGH told CW 3 to continue making payments to him in return for assisting CW 3 in securing the residency position.

246.    On or about December 4, 2012, SAYEGH deposited into his personal bank account a check for approximately $1,000, written by CW 3 and made payable to SAYEGH.

247.    In or around March 2013, SAYEGH again solicited CW 3 for another payment in return for assisting CW 3 in securing the MetroHealth Dental residency position.

248.    In or around March 2013, SAYEGH caused CW 3 to give SAYEGH a check for approximately $5,000.

249.    On or about March 4, 2013, SAYEGH deposited a check from CW 3 for approximately $5,000 into his personal bank account.

250.    In or around March 2014, SAYEGH further requested a payment from CW 3 in return for securing CW 3's residency position at MetroHealth Dental.

251.    In or around March 2014, SAYEGH caused CW 3 to give SAYEGH a check for approximately $2,000.

252.    On or about March 10, 2014, SAYEGH deposited a check from CW 3 for approximately $2,000 into his personal bank account.

*Bribes Solicited from CW 4*

253. In or around Summer 2011, SAYEGH told Cooperating Witness 4 ("CW 4"), a dentist from Jordan whose relative, Cooperating Witness 5 ("CW 5"), was also a Jordanian national and trained dentist, to talk to ALQSOUS about getting CW 5 a residency position at MetroHealth Dental.

254. In or around Summer 2011, ALQSOUS told CW 4 that there were several Jordanian candidates for the MetroHealth Dental residency program, and asked CW 4 to pay ALQSOUS approximately $25,000 to secure CW 5's position in the program. ALQSOUS informed CW 4 that a portion of the money would go to Hills, the director of the dental program.

255. In or around Summer 2011, shortly after CW 4 and CW 5 rejected ALQSOUS' request to pay $25,000 to get CW 5 into the MetroHealth Dental residency program, ALQSOUS contacted CW 4 and stated that Hills approved reducing the amount of the request to $20,000.

256. Between in or around Summer 2011 and in or around Fall 2011, ALQSOUS contacted CW 4 and requested payments from CW 4 while CW 5's candidacy was pending.

257. Between in or around Summer 2011 and in or around Fall 2011, ALQSOUS told CW 4 that he would personally pay Hills the $20,000, and that CW 4 and CW 5 could later repay him the money.

258. In or around January 2012, after CW 5 was selected for the MetroHealth Dental residency program, ALQSOUS continued to solicit CW 4 for $20,000.

259. In or around July 2012, after CW 4 and CW 5 refused to pay ALQSOUS in relation to the MetroHealth Dental residency program, and after CW 5 began a residency at MetroHealth Dental, ALQSOUS and Hills attempted to confront CW 5 and threaten CW 5 in retaliation for not paying the bribe.

260.    On or about July 17, 2012, Hills sent a text message to ALQSOUS instructing ALQSOUS to "set up a meeting with [CW 5] for tomorrow but let [CW 5] know today so [CW 5] has this on [CW 5's] mind."

261.    On or about July 17, 2012, after receiving the above-mentioned text message from Hills, ALQSOUS sent a text message to CW 9, CW 5's supervisor, instructing CW 9 to set up a meeting with CW 5 the next day, stating, "Boas lets meet tom at 7:30 with [CW 5]."

All in violation of Title 18, United States Code, Section 371.

The Grand Jury further charges:

## COUNT 4
### Conspiracy to Commit Honest Services Mail Fraud and Wire Fraud
(Title 18, U.S.C. § 1349)

262.    The factual allegations of Paragraphs 1-3, 22, 24-25, 27-28, 30, 38-42, 46, 194-196, 204-220, and 222-261 of this Indictment are hereby repeated, re-alleged and incorporated by reference as if fully set forth herein.

263.    At all times relevant to this Indictment, MetroHealth, MetroHealth Dental and the MetroHealth Board of Trustees had an intangible right to the honest services of their employees. As employees for MetroHealth and MetroHealth Dental, Defendants SARI ALQSOUS, YAZAN B. AL-MADANI and TARIQ SAYEGH owed MetroHealth, MetroHealth Dental and the MetroHealth Board of Trustees a duty to refrain from receiving bribes and kickbacks in exchange for Defendants' actions and influence.

264.    From in or around January 1, 2008, through in or around December 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants SARI ALQSOUS, YAZAN B. AL-MADANI, TARIQ SAYEGH and others known and unknown to the Grand Jury did knowingly and intentionally combine, conspire, confederate and agree with others to commit

federal offenses, that is, to devise a scheme and artifice, to wit, the scheme and artifice to defraud and deprive MetroHealth, MetroHealth Dental and the MetroHealth Board of Trustees of their intangible right to the honest and faithful services of ALQSOUS, AL-MADANI and SAYEGH through bribes and kickbacks, and the concealment of material information related thereto, as described in the factual allegations of Paragraphs 204-220 and 222-261 of this Indictment, and for purposes of executing such scheme and artifice:

        a.    to cause matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, according to the directions thereon; and

        b.    to transmit and cause to be transmitted by means of wire communication in interstate commerce any writings, signs, signals, pictures and sounds

in violation of Title 18, United States Code, Sections 1341, 1343 and 1346.

Objects of the Conspiracy

265.    It was an object of the conspiracy that SARI ALQSOUS, YAZAN B. AL-MADANI and TARIQ SAYEGH, having devised a scheme and artifice to defraud, including a scheme and artifice to deprive MetroHealth, MetroHealth Dental and the MetroHealth Board of Trustees of their intangible right to the honest services of Defendants, by soliciting and accepting bribes and kickbacks in return for favorable action in connection with Resident Dentist applications for the MetroHealth Dental Residency program.

266.    It was a further object of the conspiracy that ALQSOUS, SAYEGH, AL-MADANI, their co-conspirators, accomplices and confederates sought payments in return for favorable official action as described in Paragraph 265.

58

267. It was a further object of the conspiracy that ALQSOUS, SAYEGH, AL-MADANI and their co-conspirators concealed, attempted to conceal and encouraged others to conceal from MetroHealth, the public and law enforcement their corrupt relationship with one another and their solicitation of bribes from resident dentist candidates, and to maintain their employment at MetroHealth so they could continue to solicit bribes from future resident dentist candidates.

### Acts in Furtherance of the Conspiracy

268. In furtherance of the conspiracy, and to effect the objects thereof, SARI ALQSOUS, YAZAN B. AL-MADANI, TARIQ SAYEGH and others committed the acts described in the following paragraphs, in the Northern District of Ohio and elsewhere.

269. On or about the dates listed below Defendants SARI ALQSOUS, YAZAN B. AL-MADANI, TARIQ SAYEGH and others caused matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, to be delivered according to the directions thereon, including the following matters, from the Northern District of Ohio to the locations set forth below:

| Approximate Date of Mailing | Description of Mailing | Recipient and Location |
|---|---|---|
| February 2009 | MetroHealth Hiring Letter | CW 1 Amman, Jordan |
| March 2012 | MetroHealth Hiring Letter | CW 5 Westland, Michigan |

270. On or about the dates listed below Defendants SARI ALQSOUS, YAZAN B. AL-MADANI, TARIQ SAYEGH and others, for purposes of executing the above-described scheme and artifice, caused to be transmitted by means of wire communications in interstate and foreign commerce the writings, signs, signals, pictures and sounds described below:

| Approximate Date of Wire | Description of Wire | Originating Location | Recipient and Location |
|---|---|---|---|
| October 29, 2008 | ALQSOUS Solicitation email | Cleveland, Ohio | CW 1 Jordan |
| November 1, 2008 | ALQSOUS email with ALQSOUS bank account information | Cleveland, Ohio | CW 1 Jordan |
| November 5, 2008 | Approximate $5,000 wire from CW 1 through Cairo Amman Bank, Amman, Jordan | Amman, Jordan | ALQSOUS Cleveland, Ohio |
| January 2, 2009 | Approximate $4,973 wire transfer from CW 1's relative through Cairo Amman Bank, Amman, Jordan | Amman, Jordan | ALQSOUS Cleveland, Ohio |
| January 26, 2009 | Match Notification | Toronto, Canada | MetroHealth, Cleveland, Ohio |
| January 26, 2009 | Match Notification | Toronto, Canada | CW 1, Jordan |
| March 6, 2009 | Approximate $4,970 wire transfer from CW 1's relative through Cairo Amman Bank, Amman, Jordan | Amman, Jordan | ALQSOUS Cleveland, Ohio |
| March 10, 2009 | Credentialing and Visa Sponsorship email | MetroHealth, Cleveland, Ohio | CW 1, Jordan |
| December 2010 | SAYEGH Solicitation phone call to CW 3 | Cleveland, Ohio | CW 3 Jordan |
| January 31, 2011 | Match Notification | Toronto, Canada | MetroHealth, Cleveland, Ohio |
| January 31, 2011 | Match Notification | Toronto, Canada | CW 2, Jordan |
| January 31, 2011 | Match Notification | Toronto, Canada | MetroHealth, Cleveland, Ohio |
| January 31, 2011 | Match Notification | Toronto, Canada | CW 3, Jordan |
| February 14, 2011 | Email Confirming Match and Welcome to MetroHealth | MetroHealth, Cleveland, Ohio | CW 2, Jordan |
| February 14, 2011 | Email Confirming Match and Welcome to MetroHealth | MetroHealth, Cleveland, Ohio | CW 3, Jordan |
| March 3, 2011 | Credentialing and Visa Sponsorship | MetroHealth, Cleveland, Ohio | CW 2, Jordan |

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

## COUNT 5
Corrupt Solicitation and Acceptance of a Bribe
in Relation to a Program Receiving Federal Funds
(Title 18, U.S.C. § 666(a)(1)(B) and 2)

271.    The factual allegations of Paragraphs 1-3, 17-18, 22-23, 28-29, 41-42, 46, 194-196, and 198-199 of this Indictment are hereby repeated, re-alleged and incorporated as if fully set forth below.

272.    MetroHealth Hospital and MetroHealth Dental were organizations of the state of Ohio that received federal funds in excess of $10,000 between August 1, 2011, and July 31, 2012.

273.    Beginning on or about August 1, 2011, and continuing through on or about July 31, 2012, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants SARI ALQSOUS and TARIQ SAYEGH, agents of MetroHealth, and others known and unknown to the Grand Jury, did corruptly solicit, demand, accept and agree to accept for the benefit of any person things of value from CW 4 and CW 5 and their designees, namely, approximately $25,000, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of MetroHealth involving $5,000 or more; that is, a position for CW 5 as a Resident Dentist in the MetroHealth Dental residency program.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

The Grand Jury further charges:

**COUNT 6**
Corrupt Solicitation and Acceptance of a Bribe
in Relation to a Program Receiving Federal Funds
(Title 18, U.S.C. § 666(a)(1)(B) and 2)

274.    The factual allegations of Paragraphs 1-3, 22-23, 25-26, 28-29, 40, 194-196, and 198-200 of this Indictment are hereby repeated, re-alleged and incorporated as if fully set forth below.

275.    MetroHealth Hospital and MetroHealth Dental were organizations of the state of Ohio that received federal funds in excess of $10,000 between October 1, 2010, and September 30, 2011.

276.    Beginning on or about October 1, 2010, and continuing through on or about September 30, 2011, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants SARI ALQSOUS, YAZAN B. AL-MADANI and TARIQ SAYEGH, agents of MetroHealth, and others known and unknown to the Grand Jury, did corruptly solicit, demand, accept and agree to accept for the benefit of any person things of value from CW 3 and CW 3's designees, namely, approximately $20,000, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of MetroHealth involving $5,000 or more; that is, a position for CW 3 as a Resident Dentist in the MetroHealth Dental residency program.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

The Grand Jury further charges:

## COUNT 7
Corrupt Solicitation and Acceptance of a Bribe
in Relation to a Program Receiving Federal Funds
(Title 18, U.S.C. § 666(a)(1)(B) and 2)

277.    The factual allegations of Paragraphs 1-3, 22-23, 25-26, 28-29, 39, 194-196, and 198-200 of this Indictment are hereby repeated, re-alleged and incorporated as if fully set forth below.

278.    MetroHealth Hospital and MetroHealth Dental were organizations of the state of Ohio that received federal funds in excess of $10,000 between August 1, 2010, and July 31, 2011.

279.    Beginning on or about August 1, 2010, and continuing through on or about July 31, 2011, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants SARI ALQSOUS, TARIQ SAYEGH and YAZAN B. AL-MADANI, agents of MetroHealth, and others known and unknown to the Grand Jury, did corruptly solicit, demand, accept and agree to accept for the benefit of any person things of value from CW 2 and CW 2's designees, namely, approximately $15,000, intending to be influenced and rewarded in connection with any business, transaction and series of transactions of MetroHealth involving $5,000 or more; that is, a position for CW 2 as a Resident Dentist in the MetroHealth Dental residency program.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

The Grand Jury further charges:

## COUNT 8
Conspiracy to Commit Money and Property Mail and Wire Fraud;
*The Oral Health Enrichment Scheme*
(Title 18, U.S.C. § 1349)

General Allegations:

280.    The factual allegations of Paragraphs 1-3, 12-13, 17, 20-22, 25, 31-32, 44, 46, and

48 of this Indictment are hereby repeated, re-alleged and incorporated by reference as if fully set

forth herein.

281.    One of the chief functions of the Ohio State Dental Board ("OSDB" or "the

Dental Board") was the Enforcement and Disciplinary Process.   OSDB was responsible for

acting on complaints through investigations, inquiries and inspections.  Following an

investigation and determination, the OSDB Board had the power to revoke or suspend a dentist's

license, seek an injunction against the dentist, or enter into a consent agreement with the dentist.

The secretary of the Dental Board served as its chief investigatory member, and oversaw all

enforcement actions, including monitoring consent agreements with dentists whose licenses were

suspended or lapsed.

282.    Other than HILLS and CW 7, OHE employed only one other person, OHE

Employee 1, who worked for OHE from in or around 2011 to in or around 2012.

### The Conspiracy

283.    From in or around January  2009, through in or around December 2014, in the

Northern District of Ohio, Eastern Division, and elsewhere, Defendants EDWARD R. HILLS,

SARI ALQSOUS, YAZAN B. AL-MADANI and others known and unknown did knowingly

and intentionally combine, conspire, confederate and agree with others to commit federal

offenses, that is, to devise a scheme and artifice to defraud MetroHealth and MetroHealth Dental

64

and to obtain money and property from those entities by means of materially false and fraudulent

pretenses, representations, promises and by the omission of material facts, and for purposes of

executing such scheme and artifice:

      a.  to cause matters to be placed in any post office and authorized depository for

          mail matter to be sent and delivered by the United States Postal Service and

          private and commercial interstate carrier; and

      b.  to transmit and cause to be transmitted wire communications in interstate

          commerce, any writings, signs, signals, pictures and sounds

in violation of Title 18, United States Code, Sections 1341 and 1343.

Objects of the Conspiracy

284.    It was an object of the conspiracy that HILLS, with the assistance of ALQSOUS

and AL-MADANI, deprived MetroHealth and MetroHealth Dental of money and property by

using MetroHealth money and property to benefit HILLS' private business, OHE.

285.    It was further an object of the conspiracy that HILLS, ALQSOUS and AL-

MADANI concealed their involvement in the privately run and ongoing OHE business on

MetroHealth property, and at MetroHealth's expense, from MetroHealth, the public and law

enforcement.

Manner and Means

It was a part of the Conspiracy that:

286.    As set forth in greater detail below, (1) HILLS and others lied to and deceived

OHE client dentists and state dental boards by fraudulently promising that their company had

the ability to properly conduct "clinical assessments," when HILLS and others well knew that

OHE neither had its own clinical facilities nor permission or authority to use the MetroHealth

65

facilities for their private financial gain; (2) HILLS and others deceptively directed client dentists to the MetroHealth facilities under the pretense that such facilities were under the control of OHE; (3) HILLS, ALQSOUS, AL-MADANI and others misused and abused their positions of authority in MetroHealth and the OSDB to operate HILLS' private business using the money, resources and property of MetroHealth, and the time of MetroHealth employees; and (4) HILLS, ALQSOUS, AL-MADANI and others falsely and fraudulently concealed from MetroHealth that they were using MetroHealth monies, properties, time and resources for the benefit of HILLS and his private OHE business.

287.    In or around January 2009, as HILLS entered the final months of his tenure on the Ohio State Dental Board, and while he held the position of Secretary on that board, HILLS prepared to open his private dentist remediation business, OHE.

288.    HILLS and others solicited business for OHE from Ohio-licensed dentists, and dentists throughout the United States, whose licenses were suspended or lapsed and required remediation.  In recruiting these dentists, HILLS and others falsely and fraudulently claimed that OHE had the ability to provide clinical assessments in a proper clinical facility, when in truth and in fact, as they then well knew, OHE did not have a clinical facility or personnel it was authorized to use for private business purposes.

289.    HILLS used his relationships, connections and influence with state dental boards in Ohio, Kentucky, Texas and elsewhere, to obtain access to client dentists for his private business, OHE, which he operated out of and at the expense of MetroHealth and MetroHealth Dental.

290.    HILLS paid and offered to pay public officials, including the Executive Directors of state dental boards, "referral fees" for securing business for OHE, and paid for the dental board officials' flights and travel expenses to other states to promote OHE.

291.    HILLS and others lied to and deceived state dental boards by fraudulently promising that OHE had the ability to properly conduct "clinical assessments," when HILLS then well knew that OHE neither had its own clinical facilities nor permission or authority to use the MetroHealth facilities for their private financial gain.

292.    On or about January 27, 2009, while HILLS was still a member of the OSDB and serving as Secretary with oversight over enforcement and licensing actions, HILLS and PE 1 issued and caused to be issued an order to OSDB adding OHE to the list of OSDB-approved dental remediation programs, which was sent to Ohio-licensed dentists subject to remediation requirements.   Neither HILLS nor PE 1 informed the other OSDB members that OHE was added to the list of approved remediation providers.

293.    From in or around January 2009, through in or around April 2009, HILLS, while still OSDB Secretary, and PE 1 steered dentists subject to remediation to OHE.

294.    From in or around April 2009 through in or around October 2009, after HILLS left the OSDB, HILLS and PE 1 continued to steer dentists subject to remediation to OHE.

295.    In or around October 2009, HILLS and PE 1 coordinated with one another and PE 1 copied confidential information concerning OSDB matters about OHE to HILLS, without OSDB's knowledge or approval and in violation of Ohio Revised Code, Sections 102.03 and 4715.03.

296.    Once OHE secured business from a client dentist for remediation purposes, HILLS and others directed client dentists to the MetroHealth facilities under the pretense that

such facilities were under the control of OHE, when, as they well knew, they had neither permission nor authority to use MetroHealth resources or personnel for OHE's benefit.

297.    HILLS and others directed ALQSOUS, AL-MADANI and other MetroHealth and MetroHealth Dental employees to conduct the clinical assessments of the OHE client dentists, in the MetroHealth facilities, at the same time and while those MetroHealth employees were working for MetroHealth, and using MetroHealth monies, property, time and resources to the benefit of HILLS and OHE.

298.    Neither HILLS, OHE nor any other beneficiaries of OHE paid ALQSOUS, AL-MADANI or any other MetroHealth or MetroHealth Dental employee wages for the time they spent providing services to the OHE client dentists.

299.    Neither HILLS, OHE nor any other beneficiaries of OHE paid or reimbursed MetroHealth in return for the wages of ALQSOUS, AL-MADANI or any other employee of MetroHealth for the time that employee provided services to OHE client dentists while also working for MetroHealth.

300.    Neither HILLS, OHE nor any other beneficiaries of OHE paid or reimbursed MetroHealth in return for the costs of running and maintaining MetroHealth or MetroHealth Dental, or for MetroHealth monies and property otherwise used for OHE's private business concerns.

301.    HILLS, ALQSOUS, AL-MADANI and others falsely and fraudulently concealed from MetroHealth that they were using MetroHealth monies, property, time and resources for the benefit of the private OHE business.

302.     HILLS, ALQSOUS, AL-MADANI and others concealed from MetroHealth and MetroHealth Dental their misuse and appropriation of MetroHealth and MetroHealth Dental personnel and resources to their and OHE's advantage.

Acts in Furtherance of the Conspiracy

303.     In furtherance of the conspiracy, and to effect the objects thereof, SARI ALQSOUS, YAZAN B. AL-MADANI, TARIQ SAYEGH and others committed the acts described in the following paragraphs, in the Northern District of Ohio and elsewhere.

304.     On or about the dates listed below, in the Northern District of Ohio and elsewhere, Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI and others, for the purpose of executing the above-described scheme and artifice, caused matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier to be delivered according to the directions thereon, from the Northern District of Ohio to the locations listed below, including the following matters:

| Approximate Date | Description of Document | Recipient | Recipient Location |
|---|---|---|---|
| April 13, 2009 | Letter of Agreement | OHE Client 1 | Chagrin Falls, Ohio |
| July 24, 2009 | Letter of Agreement | OHE Client 2 | Charleston, West Virginia |
| January 4, 2009 | Letter of Agreement | OHE Client 3 | Lexington, Kentucky |
| October 4, 2010 | Letter of Agreement | OHE Client 4 | Dripping Springs, Texas |
| July 18, 2011 | Letter of Agreement | OHE Client 5 | Lafayette Hill, Pennsylvania |
| February 13, 2012 | Letter of Agreement | OHE Client 6 | Morehead, Kentucky |
| September 11, 2012 | Letter of Agreement | OHE Client 7 | Alvaton, Kentucky |
| September 12, 2012 | Letter of Agreement | OHE Client 8 | Houston, Texas |

| Approximate Date | Description of Document | Recipient | Recipient Location |
|---|---|---|---|
| August 28, 2013 | Complaint Response | OHE Client 4 | Dripping Springs, Texas |

305.    On or about the dates listed below Defendants EDWARD R. HILLS, SARI

ALQSOUS, YAZAN B. AL-MADANI and others, sent and caused to be sent by means of wire

communications in interstate and foreign commerce the writings, signs, signals, pictures and

sounds described below:

| Approximate Date | Description of Wire | Originating Location | Recipient and Location |
|---|---|---|---|
| October 1, 2009 | Instructions to visit MetroHealth for Clinical Examination | OHE Cleveland, Ohio | OHE Client 2<br><br>Charleston, West Virginia |
| March 25, 2010 | Clinical Exam Results | OHE Cleveland, Ohio | New Jersey State Dental Board<br><br>Trenton, New Jersey |
| December 3, 2010 | Instructions to visit MetroHealth for Clinical Examination | OHE Cleveland, Ohio | OHE Client 3<br><br>Lexington, Kentucky |
| February 7, 2011 | Clinical Exam Results | OHE Cleveland, Ohio | Texas State Dental Board<br><br>Austin, TX |
| March 21, 2011 | Clinical Exam Results | OHE Cleveland, Ohio | Texas State Dental Board<br><br>Austin, TX |

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

**COUNTS 9 - 12**
Money and Property Mail Fraud
(Title 18, U.S.C. §§ 1341 and 2)

306.    The factual allegations of Paragraphs 1-3, 12-13, 17, 20-22, 25, 31-32, 44, 46, 48, 281-282, 286-302, and 304 of this Indictment are hereby repeated, re-alleged and incorporated by reference as if fully set forth herein.

<u>Statutory Violation</u>

307.    From in or around January 2009 through in or around December 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI and others known and unknown to the Grand Jury, devised a scheme and artifice to defraud MetroHealth and MetroHealth Dental and to obtain money and property, by means of false and fraudulent pretenses, representations and promises, as described-above in Paragraphs 286-302 and 304 (The Oral Health Enrichment Scheme).

308.    On or about the dates below for the purposes of executing and attempting to execute the above-described scheme and artifice to defraud and to obtain money and property, Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI and others knowingly caused matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Services and private and commercial interstate carrier to be delivered according to the directions thereon, from the Northern District of Ohio to the locations listed below, including the following matters:

| COUNT | Approximate Date | Description of Document | Recipient Initials | Recipient Location |
|-------|------------------|------------------------|--------------------|--------------------|
| 9 | February 13, 2012 | Letter of Agreement | OHE Client 6 | Morehead, Kentucky |
| 10 | September 11, 2012 | Letter of Agreement | OHE Client 7 | Alvaton, Kentucky |

| COUNT | Approximate Date | Description of Document | Recipient Initials | Recipient Location |
|---|---|---|---|---|
| 11 | September 12, 2012 | Letter of Agreement | OHE Client 8 | Houston, Texas |
| 12 | August 28, 2013 | Complaint Response | OHE Client 4 | Dripping Springs, Texas |

All in violation of Title 18, United States Code, Sections 1341 and 2.

The Grand Jury further charges:

## COUNT 13
Conspiracy to Solicit, Receive, Offer and Pay Health Care Kickbacks;
*The Dental Patient Kickback and Bribery Scheme*
(Title 18, U.S.C. § 371)

309.    The factual allegations of Paragraphs 1-3, 5-11, 17, 22, 25, 34, and 36 of this Indictment are hereby repeated, re-alleged and incorporated by reference as if fully set forth herein.

310.    At all times material to this Indictment, individuals covered by the MetroHealth Care Plus program could only receive coverage for treatment at MetroHealth and MetroHealth Dental.  Such individuals were not covered for treatment received at private dental clinics not otherwise controlled by MetroHealth or MetroHealth Dental.

### The Conspiracy

311.    From in or around March 2013 and continuing through in or around December 2014, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants EDWARD R. HILLS, YAZAN AL-MADANI, SARI ALQSOUS and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with others to commit certain offenses against the United States, that is:

   a.   To violate Title 42, United States Code, Section 1320a-7b(b)(1)(A) by knowingly and willfully soliciting and receiving any remuneration (including any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in cash and in kind in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by Medicaid, a federal health program as defined by Title 18, United States Code, Section 24(b); and

73

b.  To violate Title 42, United States Code, Section 1320a-7b(b)(2)(A) by knowingly and willfully offering and paying any remuneration (including any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in cash and in kind in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by Medicaid, a federal health program as defined by Title 18, United States Code, Section 24(b).

### Object of the Conspiracy

312.  It was the object of the conspiracy that HILLS, AL-MADANI and ALQSOUS, used HILLS' official position to enrich themselves by offering, paying, soliciting, and receiving kickbacks and bribes in exchange for referring MetroHealth Dental Medicaid beneficiaries to BFD.

### Manner and Means

It was part of the conspiracy that:

313.  AL-MADANI and ALQSOUS owned, operated and controlled private dental clinics – BFD and NDC – for the purpose of billing Medicaid for services rendered to Medicaid recipients.

314.  AL-MADANI and ALQSOUS entered into a kickback and bribery relationship with HILLS where AL-MADANI and ALQSOUS offered and paid kickbacks and bribes to HILLS for Medicaid recipients that HILLS, and other MetroHealth employees acting under HILLS' authority and orders, referred from MetroHealth Dental to BFD and NDC.  These payments were made to HILLS by checks drawn on the NDC bank accounts.

315.    HILLS, AL-MADANI and ALQSOUS took steps to conceal and cover-up their activity and the nature and scope of their dealings with BFD and NDC by, among other things, falsely claiming on checks written to HILLS that the checks were for "professional fees" or "consultation fees," and by falsely and fraudulently claiming and telling others at MetroHealth that the patients HILLS sent to ALQSOUS, AL-MADANI, BFD and NDC were actually non-paying Care Plus patients when, as they well knew, they were in fact paying Medicaid patients.

Overt Acts

316.    In furtherance of the conspiracy, and to effect the objects thereof, HILLS, ALQSOUS, AL-MADANI and others committed the overt acts described in the following paragraphs in the Northern District of Ohio and elsewhere.

317.    On or about March 26, 2013, ALQSOUS and AL-MADANI filed and caused to be filed articles of incorporation with the Ohio Secretary of State for a company named "Drs. Almadani and Alqsous, Inc.," under which articles of incorporation they operated NDC.

318.    On or about April 11, 2013, ALQSOUS and AL-MADANI filed and caused to be filed with the Ohio Secretary of State a fictitious name change for their company "Drs. Almadani and Alqsous, Inc." and created the fictitious name of "Noble Dental Clinic presented by Drs. Almadani and Alqsous," under which name they operated NDC.

319.    On or about April 25, 2013, AL-MADANI and ALQSOUS filed and caused to be filed a Medicaid provider agreement for NDC.

320.    On or about April 30, 2013, AL-MADANI filed and caused to be filed with the Ohio Secretary of State articles of incorporation for BFD.

321.    On or about December 31, 2013, AL-MADANI and ALQSOUS filed and caused to be filed an application for BFD to become an enrolled provider in the Ohio Medicaid program.

322.   AL-MADANI and ALQSOUS signed, acknowledged and filed their provider applications, acknowledging that they understood Medicaid rules on billings and that they could not accept or offer bribes or kickbacks in relation to Medicaid recipients.

323.   In or around March 2013 and through December 2014, HILLS, AL-MADANI and ALQSOUS agreed to refer dental patients, including Medicaid recipients, from MetroHealth Dental to BFD, in return for ALQSOUS and AL-MADANI providing HILLS with kickbacks.

324.   On or about January 7, 2014, ALQSOUS sent a text message to AL-MADANI, stating, "We will give 1000 pay roll instead of the 1000 for hills."

325.   On or about the dates listed below, ALQSOUS and AL-MADANI paid HILLS the amounts listed below by check written to "EDWARD HILLS" and drawn from the NDC Bank Accounts, and containing false notations that they were for "consultation fees" or "profession fees," each check constituting a separate overt act:

| Overt Act | Date | Amount | Description |
|-----------|------|--------|-------------|
| a. | January 7, 2014 | $1,100 | Check #1106 from NDC to HILLS |
| b. | February 5, 2014 | $2,100 | Check #1118 from NDC to HILLS |
| c. | March 15, 2014 | $3,100 | Check #1141 from NDC to HILLS |
| d. | April 9, 2014 | $3,100 | Check #1655 from NDC to HILLS |
| e. | May 7, 2014 | $2,100 | Check #1666 from NDC to HILLS |
| f. | June 4, 2014 | $3,100 | Check # 1679 from NDC to HILLS |
| g. | July 1, 2014 | $3,000 | Check #1702 from NDC to HILLS |

326.   In or around June 2014, HILLS ordered MetroHealth Dental staff to direct and refer MetroHealth Dental patients, including Medicaid recipients, to BFD.

327.    In or around mid to late-2014, after HILLS, ALQSOUS and AL-MADANI became aware of a pending MetroHealth and Federal Bureau of Investigation inquiry, they falsely and fraudulently told others that the checks from NDC to HILLS were "repayments on loans," although, as they well knew, no such loans in fact existed.

328.    In or around mid to late-2014, after HILLS, ALQSOUS and AL-MADANI became aware of the MetroHealth and FBI investigation into MetroHealth Dental, ALQSOUS and AL-MADANI told others that they gave HILLS a Form 1099 in an attempt to claim that he was an employee of BFD and NDC, and to justify and conceal the kickbacks.

329.    On or about August 20, 2015, ALQSOUS and AL-MADANI caused to be delivered by United States Postal Service and by private and commercial interstate carriers, according to the directions thereon, a Form 1099 for HILLS, to the Internal Revenue Service and to HILLS, for the tax year 2014, which stated that HILLS received approximately $17,600 in payments from "Dr. Almadani and Dr. Alqsous, Inc.," the official corporate name of NDC.

330.    ALQSOUS and AL-MADANI, through BFD, caused Medicaid to make payments to BFD for Medicaid recipients referred from MetroHealth Dental to BFD, as described below, each payment constituting a separate overt act:

| Overt Act | Approximate Date of Mailing | Description of Mailing | Recipient and Location |
|---|---|---|---|
| a. | August 14, 2014 | Medicaid Check Number 0027362017 | Buckeye Family Dental, Cleveland, Ohio |
| b. | August 28, 2014 | Medicaid Check Number 0027431053 | Buckeye Family Dental, Cleveland, Ohio |
| c. | September 9, 2014 | Medicaid Check Number 0027462654 | Buckeye Family Dental, Cleveland, Ohio |
| d. | September 11, 2014 | Medicaid Check Number 0027482699 | Buckeye Family Dental, Cleveland, Ohio |

All in violation of Title 18, United States Code, Section 371.

The Grand Jury further charges:

## COUNTS 14 – 20
Receipt of Kickbacks in Connection with a Federal Health Care Program
(Title 42, U.S.C. § 1320a-7b(b)(1)(A))

331.    The factual allegations of Paragraphs 1-3, 5-11, 17, 22, 25, 34, 36, 310, 313-315,

and 317-330 of this Indictment are hereby repeated, re-alleged and incorporated by reference as

if fully set forth herein.

332.    On or about the dates listed below, in the Northern District of Ohio, Eastern

Division and elsewhere,  Defendant EDWARD R. HILLS did knowingly and willfully solicit

and receive remuneration, that is, kickbacks, directly and indirectly, overtly and covertly, in the

form of checks and things of value, from another in order to induce him to refer an individual to

a person for the furnishing and arranging for the furnishing of any item and service for which

payment may be made in whole and in part under a federal health care program as defined in

Title 18, United States Code, Section 24(b), that is, Medicaid, as set forth below:

| Count | Defendant | Date | Amount | Description |
|-------|-----------|------|--------|-------------|
| 14 | EDWARD R. HILLS | January 7, 2014 | $1,100 | Check #1106 from NDC to HILLS |
| 15 | EDWARD R. HILLS | February 5, 2014 | $2,100 | Check #1118 from NDC to HILLS |
| 16 | EDWARD R. HILLS | March 15, 2014 | $3,100 | Check #1141 from NDC to HILLS |
| 17 | EDWARD R. HILLS | April 9, 2014 | $3,100 | Check #1655 from NDC to HILLS |
| 18 | EDWARD R. HILLS | May 7, 2014 | $2,100 | Check #1666 from NDC to HILLS |
| 19 | EDWARD R. HILLS | June 4, 2014 | $3,100 | Check #1679 from NDC to HILLS |
| 20 | EDWARD R. HILLS | July 1, 2014 | $3,000 | Check #1702 from NDC to HILLS |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

The Grand Jury further charges:

## COUNTS 21 – 27
Offering or Paying Kickbacks in Connection with Federal Health Care Program
(Title 42, U.S.C. § 1320a-7b(b)(2)(A))

333.　The factual allegations of Paragraphs 1-3, 5-11, 17, 22, 25, 34, 36, 310, 313-315, and 317-330 of this Indictment are hereby repeated, re-alleged and incorporated by reference as if fully set forth herein.

334.　On or about the dates listed below, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants SARI ALQSOUS and YAZAN AL-MADANI did knowingly and willfully offer to pay and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in the forms of checks and things of value to another, that is, Edward R. Hills, to induce him to refer an individual to a person for the furnishing and arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program as defined in Title 18, United States Code, Section 24(b), that is, Medicaid, as set forth below:

| Count | Defendants | Date | Amount | Description |
|-------|------------|------|--------|-------------|
| 21 | SARI ALQSOUS, YAZAN B. AL-MADANI | January 7, 2014 | $1,100 | Check #1106 from NDC to HILLS |
| 22 | SARI ALQSOUS, YAZAN B. AL-MADANI | February 5, 2014 | $2,100 | Check #1118 from NDC to HILLS |
| 23 | SARI ALQSOUS, YAZAN B. AL-MADANI | March 15, 2014 | $3,100 | Check #1141 from NDC to HILLS |
| 24 | SARI ALQSOUS, YAZAN B. AL-MADANI | April 9, 2014 | $3,100 | Check #1655 from NDC to HILLS |
| 25 | SARI ALQSOUS, YAZAN B. AL-MADANI | May 7, 2014 | $2,100 | Check #1666 from NDC to HILLS |
| 26 | SARI ALQSOUS, YAZAN B. AL-MADANI | June 4, 2014 | $3,100 | Check #1679 from NDC to HILLS |
| 27 | SARI ALQSOUS, YAZAN B. AL-MADANI | July 1, 2014 | $3,000 | Check #1702 from NDC to HILLS |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A).

The Grand Jury further charges:

## COUNT 28
Conspiracy to Commit Honest Services and Money and Property Mail Fraud
(Title 18, U.S.C. § 1349)

335.    The factual allegations of Paragraphs 1-3, 5-11, 17, 19-20, 22, 24-25, 27, 34, 36,

310, 313-315, and 317-330 of this Indictment are hereby repeated, re-alleged and incorporated

by reference as if fully set forth herein.

336.    At all times relevant to this Indictment, MetroHealth, MetroHealth Dental, and the

MetroHealth Board of Trustees had an intangible right to the honest services of their employees,

and the citizens of Cuyahoga County had an intangible right to the honest services of their public

officials.  As employees for MetroHealth and MetroHealth Dental, Defendants EDWARD R.

HILLS, SARI ALQSOUS and YAZAN B. AL-MADANI owed MetroHealth, MetroHealth

Dental, and the MetroHealth Board of Trustees, and as a public official HILLS owed the citizens

of Cuyahoga County, Ohio, a duty to refrain from receiving bribes and kickbacks in exchange

for Defendants' actions and influence.

337.    From in or around March 2013 through in or around December 2014, in the

Northern District of Ohio, Eastern Division, and elsewhere, Defendants EDWARD R. HILLS,

YAZAN AL-MADANI, SARI ALQSOUS and others known and unknown did knowingly and

intentionally combine, conspire, confederate and agree with others to commit federal offenses,

that is, to devise a scheme and artifice, to wit, the scheme and artifice described above in the

factual allegations of Paragraphs 313-315, and 317-330 of this Indictment:

>    a.    To defraud MetroHealth, MetroHealth Dental, the MetroHealth Board of Trustees
>
>          and the citizens of Cuyahoga County, Ohio, of their intangible right to the honest

and faithful services of HILLS, AL-MADANI and ALQSOUS through bribes and

kickbacks and the concealment of material information related thereto; and

b.  To defraud MetroHealth and MetroHealth Dental and to obtain money and

property from those entities by means of materially false and fraudulent pretenses,

representations, promises and omissions,

and for the purpose of executing such scheme and artifice, to cause matters to be placed in any

post office and authorized depository for mail matter to be sent and delivered by the United

States Postal Service and private and commercial interstate carrier, according to the directions

thereon, in violation of Title 18, United States Code, Sections 1341 and 1346.

### Object of the Conspiracy

338.   It was the object of the conspiracy that EDWARD R. HILLS, SARI ALQSOUS,

YAZAN B. AL-MADANI, and others, devised a scheme and artifice to defraud MetroHealth,

MetroHealth Dental, the MetroHealth Board of Trustees, and the citizens of Cuyahoga County of

their intangible right to the honest services of Defendants, and to obtain money and property by

means of false and fraudulent pretenses, representations, promises and omissions, by:

a.  Soliciting, accepting and offering bribes and kickbacks in exchange for the

referral of Medicaid patients to BFD; and

b.  Depriving MetroHealth of money and property, to wit, the Medicaid payments it

would have received for patients transferred to BFD.

### Acts in Furtherance

339.   In furtherance of the conspiracy and to effect the objects thereof, HILLS,

ALQSOUS, AL-MADANI and other co-conspirators known and unknown to the Grand Jury

committed the following acts, among others, in the Northern District of Ohio and elsewhere.

340.    On or about the dates listed below Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI and others, for the purpose of executing the above-described scheme and artifice, caused matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, to be delivered according to the directions thereon, including the following matters:

| Approximate Date of Mailing | Description of Mailing | Recipient and Location |
| --- | --- | --- |
| August 14, 2014 | Medicaid Check Number 0027362017 | Buckeye Family Dental, Cleveland, Ohio |
| August 28, 2014 | Medicaid Check Number 0027431053 | Buckeye Family Dental, Cleveland, Ohio |
| September 9, 2014 | Medicaid Check Number 0027462654 | Buckeye Family Dental, Cleveland, Ohio |
| September 11, 2014 | Medicaid Check Number 0027482699 | Buckeye Family Dental, Cleveland, Ohio |
| August 20, 2015 | 1099 Form for Defendant EDWARD R. HILLS | Internal Revenue Service, Cincinnati, Ohio |
| August 20, 2015 | 1099 Form for Defendant EDWARD R. HILLS | Defendant EDWARD R. HILLS, Aurora, Ohio |

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

## COUNT 29
Conspiracy to Obstruct Justice
*The Obstruction of Justice Scheme*
(Title 18, U.S.C. § 1512(k))

341.     The factual allegations of Paragraphs 1-48, and of Counts 1-28 and 31-33 of this Indictment are hereby re-alleged and incorporated as if fully set forth herein.

342.     From in or around May 2014 through the date of the filing of this Indictment, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service, Criminal Investigation Division ("IRS") and the Grand Jury for the Northern District of Ohio were investigating, among other things: a) whether individuals and private companies had provided things of value, including cash, checks, a briefcase, a television, goods and services, to EDWARD R. HILLS and his designees, in return for his promise to perform official acts; b) whether ALQSOUS, AL-MADANI and Sayegh solicited and accepted bribes from resident dentist applicants to the MetroHealth Dental Residency program; c) whether HILLS, ALQSOUS, AL-MADANI and others defrauded MetroHealth and MetroHealth Dental and obtained their money and property by using MetroHealth facilities, personnel, property and time of MetroHealth employees to run OHE; and d) whether HILLS, ALQSOUS, AL-MADANI and others defrauded MetroHealth and MetroHealth Dental of money and property by paying kickbacks to HILLS in return for HILLS referring Medicaid patients to BFD. In the course of that investigation, federal grand jury subpoenas from the Northern District of Ohio were issued.

343.     In or around May 2014, HILLS became aware of the federal criminal investigation.

The Conspiracy

344. Beginning in or around May 2014, and continuing through in or around the date of the filing of this Indictment, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI and others, did knowingly and intentionally conspire, combine, confederate and agree together and with each other and with others to commit an offense against the United States, namely:

a. To knowingly intimidate, threaten and corruptly persuade another person, and to attempt to do so, and to engage in misleading conduct toward another person, with intent to influence, delay and prevent the testimony of a person in an official proceeding, that is, the federal Grand Jury for the Northern District of Ohio, in violation of Title 18, United States Code, Section 1512(b)(1);

b. To knowingly intimidate, threaten and corruptly persuade another person, and to attempt to do so, and engage in misleading conduct toward another person with intent to hinder, delay and prevent the communication to a law enforcement officer of information relating to the commission and possible commission of a federal offense, in violation of Title 18, United States Code, Section 1512(b)(3);

c. To corruptly obstruct, influence and impede, and to attempt to do so, an official proceeding, that is, the federal Grand Jury for the Northern District of Ohio, in violation of Title 18, United States Code, Section 1512(c)(2);

d. To intentionally harass another person and thereby hinder, delay, prevent and dissuade any person from: attending and testifying in an official proceeding; and reporting to a law enforcement officer and judge of the United States the

84

commission and possible commission of a federal offense, all in violation of Title

18, United States Code, Section 1512(d).

## Objects of the Conspiracy

345.   It was an object of the conspiracy that HILLS, ALQSOUS, AL-MADANI and

others concealed, attempted to conceal and encouraged others to conceal from law enforcement

and the Grand Jury the fact that ALQSOUS, AL-MADANI and Sayegh had solicited, demanded

and accepted gifts, payments and other things of value from resident dentist candidates in return

for favorable official actions for those resident dentist candidates.

346.   It was also an object of the conspiracy that HILLS, ALQSOUS, and AL-

MADANI and others concealed, attempted to conceal and encouraged others to conceal from law

enforcement and the Grand Jury the fact that HILLS solicited, demanded, and accepted gifts,

payments and other things of value from ALQSOUS and AL-MADANI in exchange for

favorable official action.

347.   It was a further object of the conspiracy that HILLS and others concealed,

attempted to conceal and encouraged others to conceal from law enforcement and the Grand Jury

any evidence of HILLS' illegal activities, including any activity related to his association with

the OSDB, MetroHealth, MetroHealth Dental, and OHE.

## Manner and Means

It was part of the conspiracy that:

348.   In response to the FBI, IRS and federal Grand Jury investigation, and subsequent

subpoenas seeking information, HILLS, ALQSOUS, AL-MADANI and others instructed and

attempted to instruct members of the conspiracy and others to not cooperate with law

enforcement and to not say anything because those individuals could be deported, fired, and face criminal and civil liability.

349. In response to the FBI, IRS and Federal Grand Jury investigation, HILLS counselled others on how to discuss matters with the FBI in order to conceal their illegal activities and to obstruct the ongoing investigation.

350. In response to the FBI, IRS and Federal Grand Jury investigation, and subsequent subpoenas seeking information, ALQSOUS and AL-MADANI and others created and caused to be created documents in order to conceal the nature of the bribes and kickbacks paid by ALQSOUS and AL-MADANI to HILLS.

Acts in Furtherance of the Conspiracy

351. In furtherance of the conspiracy and to effect the objects thereof, HILLS, ALQSOUS, AL-MADANI and other co-conspirators known and unknown to the Grand Jury committed the following acts in the Northern District of Ohio and elsewhere.

352. In or around June 2014, after HILLS instructed the MetroHealth staff to refer Medicaid beneficiaries from MetroHealth to ALQSOUS' and AL-MADANI's private clinics, HILLS first told CW 9 that HILLS would be reimbursed by ALQSOUS for sending Medicaid patients to ALQSOUS and AL-MADANI, and then later claimed that he was receiving a repayment on a loan that he gave to ALQSOUS, when, in truth and fact, as HILLS then well knew, he did not provide any loans or other money to ALQSOUS or AL-MADANI.

353. In or around mid-2014, after becoming aware of a potential FBI investigation, AL-MADANI approached CW 2 and said that CW 2 should not to discuss the bribery conduct if interviewed by law enforcement, and that it was possible could CW 2 could be deported if CW 2 spoke with law enforcement.

354. In or around October 2014, HILLS told CW 9 that CW 9 should tell the FBI that MetroHealth would not lose money from the Medicaid patients HILLS sent from MetroHealth to BFD and NDC because they were "Care Plus" patients who did not pay MetroHealth for dental services, when, in truth and fact, as HILLS then well knew, MetroHealth was the only facility that received funds for "Care Plus" patients, Medicaid would not pay for "Care Plus" patients seen at BFD and NDC and paying, non-"Care Plus" customers were in fact referred to BFD and NDC.

355. In or around October 2014, HILLS instructed ALQSOUS, AL-MADANI and CW 9 to tell the FBI that the television and other items they gave to HILLS were gifts, and that HILLS initially refused the television, but that ALQSOUS, AL-MADANI and CW 9 insisted he accept it due to their Middle Eastern culture.

356. From in or around October 2014 through in or around November 2014, after learning that CW 9 interviewed with FBI Agents and discussed the MetroHealth investigation, HILLS told CW 9 to not speak with the FBI. HILLS further instructed CW 9 that there were certain ways of explaining things to the FBI to avoid making things sound bad or getting HILLS, ALQSOUS, AL-MADANI and CW 9 in trouble with law enforcement. HILLS further instructed CW 9 to downplay the bribe requested from CW 4 because CW 4's relative was the one applying to the residency program.

357. On or about November 13, 2014, HILLS met with CW 9, ALQSOUS and AL-MADANI and told them to not to cooperate with law enforcement in the ongoing FBI and Grand Jury investigation. In particular, HILLS instructed ALQSOUS, AL-MADANI and CW 9 that, "the s**t we got ourselves in this year is because motherf*****s running they mouth snitching … y'all know about Law and Order, they do it every f*****g week … what does Law and Order

do?  Snitches.  Y'all watch 48 Hours?  Snitches ... but if we tight like this and you know each other, you laugh at it ... y'all got to be tight to do that.  You can't have distrust ... if y'all started together, can't no man take you down.  My friend [T.C.], you remember my friend L.A. Tony, we tight like this.  Can't nothing get between us, I don't give a f**k what.  FBI, CIA, ex-wives, God.  It don't matter.  You ain't coming between us.  We got a bond that don't break.  Because he know I got his back, he got mine ... We just playing the game right now.  Y'all get like that, man, y'all be great ... listen to me on this, the day that you doubt each other is the day [unintelligible] y'all lose faith in each other and start second guessing each other, you'll never achieve what you [unintelligible]."

358.    On or about December 19, 2014, HILLS met with CW 9, ALQSOUS and AL-MADANI at a restaurant.  At this meeting, HILLS instructed CW 9, ALQSOUS and AL-MADANI to stick together and not turn on one another.  HILLS instructed the others that the American way was to not cooperate with law enforcement, and that their Middle Eastern culture was weak.  HILLS further instructed the group that if the FBI interviewed them, they should state that they did not know anything about HILLS' conduct.

359.    On or about August 20, 2015, ALQSOUS and AL-MADANI caused an IRS Form 1099 for HILLS to be sent to HILLS, claiming that HILLS received approximately $17,600 in wages from NDC.

360.    On or about September 29, 2015, AL-MADANI spoke with Special Agents of the Federal Bureau of Investigation and claimed that HILLS helped him and ALQSOUS find NDC, and that the checks he and ALQSOUS issued from the NDC accounts to HILLS were a "finders fee," when, in truth and fact, as he then well knew, HILLS played no role in the purchase of

NDC and did not provide any funds or monies to assist AL-MADANI and ALQSOUS in purchasing the clinic.

All in violation of Title 18, United States Code, Section 1512(k).

The Grand Jury further charges:

## COUNT 30
False Statement or Representation Made
to a Department or Agency of the United States
(Title 18, U.S.C. § 1001(a)(2))

361.    On or about September 29, 2015, in the Northern District of Ohio, Eastern Division, Defendant YAZAN B. AL-MADANI did knowingly and willfully make a materially false, fictitious and fraudulent statement and representation to Special Agents of the Federal Bureau of Investigation in a matter within the jurisdiction of the executive branch of the government of the United States, that is, AL-MADANI stated that the checks AL-MADANI and Sari Alqsous issued from the NDC accounts to Edward R. Hills were for a "finders fee," when, in truth and fact, as he then well knew, Hills played no role in the actual purchase of NDC and did not provide any funds or monies to assist AL-MADANI and Alqsous in the purchase of the clinic.

All in violation of Title 18, United States Code, Sections 1001(a)(2).

The Grand Jury further charges:

## COUNTS 31 – 33
False Statements on Tax Returns
(Title 26, U.S.C. § 7206(1))

362.    On or about the dates stated below, in the Northern District of Ohio, Eastern

Division, Defendant EDWARD R. HILLS, a resident of Aurora, Ohio, who was married, did

willfully make and subscribe U.S. Individual Income Tax Returns, Form 1040, for the calendar

years stated below, on behalf of himself and his spouse, each of which was verified by a written

declaration that it was made under the penalties of perjury and was filed with the Internal

Revenue Service, and each of which Defendant EDWARD R. HILLS did not believe to be true

and correct as to every material matter in that, as he then and there well knew and believed, each

return understated his total income (on line 22) by failing to report income Defendant EDWARD

R. HILLS had that year from Oral Health Enrichment, and from bribes, kickbacks and other

things of value he received, as a result of which each return understated the amount of taxes

owing for that year, in the approximate amounts stated below, each year constituting a separate

count:

| COUNT | YEAR | APPROXIMATE DATE | APPROXIMATE UNREPORTED INCOME | APPROXIMATE TAXES DUE AND OWING |
|---|---|---|---|---|
| 31 | 2011 | April 15, 2012 | $15,379 | $4,338 |
| 32 | 2012 | April 15, 2013 | $61,461 | $17,209 |
| 33 | 2013 | April 15, 2014 | $88,911 | $22,302 |

All in violation of Title 26, United States Code, Section 7206(1).

**FORFEITURE**

The Grand Jury further charges:

**RACKETEERING FORFEITURE**

363.    The allegations of Count 1 are hereby re-alleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. Section 1963 and 28 U.S.C. Section 2461(c).  Pursuant to Rule 32.2, Federal Rules of Criminal Procedure, notice is hereby given to the Defendants that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. Section 1963 in the event of any Defendant's conviction under Count 1 of this Indictment.  As a result of the foregoing offense, Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI, and TARIQ SAYEGH shall forfeit the following property to the United States:

a.)    Any interest Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI, and TARIQ SAYEGH acquired or maintained in violation of 18 U.S.C. Section 1962;

b.)    Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI, and TARIQ SAYEGH established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. Section 1962; and,

c.)    Any property constituting, or derived from, any proceeds which Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI, and TARIQ SAYEGH obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. Section 1962.

364.    The property subject to forfeiture to the United States pursuant to 18 U.S.C.

Sections 1963(a)(1), 1963(a)(2), and 1963(a)(3), include, but are not limited to, the following:

a.)    A sum of money equal to the total amount of proceeds obtained by Defendants

EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI, and TARIQ

SAYEGH as a result of their violation of 18 U.S.C. Section 1962, including but not

limited to the following items:

i.)    $88,895.00 in U.S. Currency seized on September 29, 2015, at the East

15th Street, Cleveland, Ohio, residence of Defendant SARI ALQSOUS pursuant

to the execution of a federal search warrant.

ii.)    Louis Vuitton briefcase purchased on or about January 1, 2013, for

Defendant EDWARD R. HILLS from a Saks 5th Avenue department store in

Beachwood, Ohio.  The purchase price was approximately $3,879.00.

iii.)    55-inch LED television purchased on or about January 6, 2014, for

Defendant EDWARD R. HILLS from a Best Buy store in the Northern District of

Ohio.  The purchase price was approximately $3,000.00.

365.    The above-named Defendants, and each of them, are jointly and severally liable

for the forfeiture obligations as alleged above.

## FORFEITURE: COUNTS 2 – 29

366.    The allegations of Counts 2 through 29, inclusive, are hereby re-alleged and

incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C.

Section 981(a)(1)(C) & 28 U.S.C. Section 2461(c) and/or 18 U.S.C. Section 982(a)(7).  As a

result of the foregoing offenses, Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN

B. AL-MADANI, and TARIQ SAYEGH shall forfeit to the United States all property, real and

personal, which constitutes, or is derived from, proceeds traceable to the commission of Counts 2 through 29, inclusive; including, but not limited to, the following:

a.) $88,895.00 in U.S. Currency seized on September 29, 2015, at the East 15th Street, Cleveland, Ohio, residence of Defendant SARI ALQSOUS pursuant to the execution of a federal search warrant.

b.) Louis Vuitton briefcase purchased on or about January 1, 2013, for Defendant EDWARD R. HILLS from a Saks 5th Avenue department store in Beachwood, Ohio. The purchase price was approximately $3,879.00.

c.) 55-inch LED television purchased on or about January 6, 2014, for Defendant EDWARD R. HILLS from a Best Buy store in the Northern District of Ohio. The purchase price was approximately $3,000.00.

d.) MONEY JUDGMENT: Defendants EDWARD R. HILLS, SARI ALQSOUS, YAZAN B. AL-MADANI, and TARIQ SAYEGH shall forfeit a sum of money equal to the total amount of proceeds obtained as a result of their respective violation(s) of Counts 2 through 29, inclusive.

A TRUE BILL.

Original Document – Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.